FILED

2023 Apr-07  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| CARA MCCLURE, GREATER BIRMINGHAM MINISTRIES, the METRO-BIRMINGHAM BRANCH OF THE NAACP, and the ALABAMA STATE CONFERENCE OF THE NAACP,<br><br>    *Plaintiffs*,<br><br>    vs.<br><br>THE JEFFERSON COUNTY COMMISSION, JAMES A. STEPHENS, in his official capacity as President; T. JOE KNIGHT, in his official capacity as President Pro Tempore; SHEILA TYSON, in her official capacity as Commissioner; STEVE AMMONS, in his official capacity as Commissioner; and LASHUNDA SCALES, in her official capacity as Commissioner,<br><br>    *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1.      Plaintiffs Cara McClure, Greater Birmingham Ministries on behalf of its members, and the Alabama State Conference of the NAACP and Metro-Birmingham Branch of the NAACP on behalf of their members (collectively, "Plaintiffs") challenge the policy of the Jefferson County Commission (the "Commission") to intentionally pack Black voters based predominately on race into two supermajority Black commission districts without a sufficiently compelling justification.

2.      On November 4, 2021, following the 2020 Census, the Commission redrew its five-commission district plan to account for population changes since 2010. Rather than assess whether compliance with Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, ("VRA") or another compelling state interest required the packing of Black voters into Districts 1 and 2 and

without addressing the cracking of communities of interest and precincts, the Commission did as it had done in the last redistricting cycle: It needlessly put more Black voters in Districts 1 and 2.

3.     In drawing the plan enacted by the Commission on November 4, 2021 ("the Enacted Plan"), the Commission's predominant motive was to place certain voters within and outside of Commission districts based on their race. The Commission's unjustified predominant racial motive in adopting the Enact Plan violates the Constitution.

4.     Plaintiffs bring this suit to challenge all Commission Districts 1, 2, 3, 4, and 5 ("Challenged Districts") as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as enforced through 42 U.S.C. § 1983.

5.     Although "redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of . . . a variety of other demographic factors," *Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("*Shaw* I"), the Equal Protection Clause prevents a state actor, from using race as the "predominant factor motivating [its] decision to place a significant number of voters within or without a particular district" in the absence of "sufficient justification," such as, for example, when necessary to comply with the VRA. *Bethune–Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

6.     In developing the Enacted Plan, race was the Commission's predominant motive. During the redistricting process, Commissioners explicitly sought to increase the concentration of Black voters in Districts 1 and 2 by removing Black voters from Districts 3, 4, and 5 to ensure two supermajority Black districts with Black voting-age populations (BVAP) well above 60% in Districts 1 and 2.

7.      As a result, the Challenged Districts bear all the typical indicia of racial predominance. Commission Districts have contorted shapes – majority white Districts 3 and 4 curve around central Birmingham in "E" shapes, halving political subdivisions, and neighborhoods surrounding Districts 1 and 2 to carve out white neighborhoods from Black ones. Districts 1 and 2, conversely, reach out from central Birmingham to grab far-flung more suburban Black communities from Center Point to Minor and Brighton. The Commission's goal was achieved in the Enacted Plan through this race-based sorting: despite around 10% population loss in both Districts 1 and 2, both districts were maintained with the supermajority BVAPs similar to the last decade. In the Enacted Plan, District 1 has a BVAP of 76.34%, and District 2 has a BVAP of 64.11%.

8.      Racial predominance in districting is justified when supported by a compelling state interest, such as compliance with the VRA. *Cooper v. Harris,* 581 U.S. 285, 292 (2017). But there is no such compelling state interest to justify the Commission's race-based sorting of voters here. In the absence of extreme racial polarization, nothing in the VRA requires the packing of Black voters or any other minority group such that they constitute an excessive majority in a particular district. In fact, the voting strength of a politically cohesive minority group can be diluted either "by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

9.      The Commissioners were not attempting to comply with the VRA. The Commission never assessed whether racially polarized voting or the totality of circumstances required the creation of supermajority Black districts. Indeed, Commissioners made no mention of compliance with the VRA during the redistricting process. The Commission failed to conduct any

racially polarized voting analysis or any other analysis to determine whether the BVAPs in the Challenged Districts were necessary to comply with the VRA or federal law. Nor did the Commission attempt to determine how Districts 1 and 2 might function with significantly lower BVAPs closer to or below 50%. A racial polarization analysis of Jefferson County would have made clear that supermajority Black districts are not necessary for Black voters to have an equal opportunity to elect candidates of choice in Districts 1 and 2.

10. Plaintiffs, Black registered voters, and civil rights organizations, on behalf of their members who reside in the Challenged Districts, bring this action for declaratory and injunctive relief to prevent the unnecessary sorting of voters on the basis of race in violation of the U.S. Constitution.

**PARTIES**

11. Plaintiff CARA MCCLURE is a Black lawfully registered Alabama voter residing in Birmingham, Alabama, in Jefferson County Commission District 2. Ms. McClure is over the age of eighteen and a United States citizen eligible to vote. Ms. McClure is and will continue to be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts where race was the Commission's predominant motive for placing her and others within districts.

12. Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM seeks to address urgent human rights and social justice needs in the greater Birmingham area. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

13.    GBM is dedicated to advancing social justice through political participation in Jefferson County as well as across the state of Alabama. GBM actively opposes local and state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward that end, GBM regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people, as well as people with disabilities.

14.    GBM has around 5,000 individual members located primarily throughout the greater Birmingham, Alabama area. GBM has members who are registered lawfully registered Black and other Alabama voters who live and vote in each of the Challenged Districts. If not enjoined, these members will continue to be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts where race was the Commission's predominant motive for placing these members and others within and outside of districts.

15.    Plaintiff Metro Birmingham Branch of the NAACP ("Metro-Birmingham NAACP") is a nonpartisan non-profit membership organization serving the greater Birmingham metropolitan area and is an affiliate of the Alabama State Conference of the NAACP.

16.    The Metro-Birmingham NAACP's mission is to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination. Pursuant to this mission, Metro-Birmingham NAACP has advocated for the voting rights of African Americans and other voters of color residing in the greater Birmingham metropolitan area and Jefferson County, including the rights of its members.

17.    The Metro-Birmingham NAACP has active members throughout Birmingham and the surrounding area who are Black. Its members include lawfully registered Black voters who reside and vote in the Challenged Districts. These members have been and, if the Challenged

Districts are not enjoined, will continue to be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts where race was the Commission's predominant motive for placing these members and others within and outside of districts.

18.    Plaintiff Alabama State Conference of the NAACP ("Alabama NAACP") oversees all Alabama local branches of the National Association for the Advancement of Colored People, Inc., including the Metro-Birmingham Branch in Jefferson County. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate Black American voters, and encourages Black Alabamians to engage in the political process by turning out to vote on Election Day.

19.    The Alabama NAACP is a membership organization with approximately 5,000 members across the State, approximately 95% of whom identify as Black and most of whom are lawfully registered voters. It has members who are lawfully registered Black and non-Black Alabama voters who live and vote in each and each of the Challenged Districts. These members have been and, if the Challenged Districts are not enjoined, will be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts where race was the Commission's predominant motive for placing these members and others within and outside of districts.

20.    Defendant Jefferson County Commission is the governing body of Jefferson County, Alabama. Pursuant to its authority under Code of Alabama Sections 45-37-72(a) and 11-3-1.1(a). The Commission consists of five commissioners who are each elected from single-

6

member districts in Jefferson County. The Commission prepared, developed, and drew the redistricting plans for the Challenged Districts based on the 2020 decennial census. The Commission, including each of the individual Commissioners sued in their official capacities, are charged with ensuring the Commission's compliance with the Constitution. The Commission has the discretion and authority to adopt nondiscriminatory districts. Ala. Code § 11-3-1.1(a). It approved and adopted the Enacted Plan and the Challenged Districts that are racially gerrymandered in violation of the Constitution.

1.      JAMES A. STEPHENS is President of the Jefferson County Commission and the elected Commissioner for District 3. Mr. Stephens is sued in his official capacity only.

2.      T. JOE KNIGHT is President Pro Tempore of the Jefferson County Commission and the elected Commissioner for District 4. He is the liaison to the board of registrars, the circuit clerks, the district attorney, the state courts, and the probate judge of Jefferson County. Mr. Knight is sued in his official capacity only.

3.       SHEILA TYSON is the elected Commissioner for District 2. Ms. Tyson is sued in her official capacity only.

4.      STEVE AMMONS is the elected Commissioner for District 5. Mr. Ammons is sued in his official capacity only.

5.      LASHUNDA SCALES is the elected Commissioner for District 1. Ms. Scales is sued in her official capacity only.

### JURISDICTION AND VENUE

6.      This action arises under the Fourteenth Amendment to the U.S. Constitution.

7. This Court has subject matter jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

8. This Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

9. This Court has personal jurisdiction over the Defendants, who are all citizens of Alabama.

10. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendants reside in this District and the state of Alabama, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

11. Between 1931 and 1985, the Jefferson County Commission was composed of three commissioners who were elected at-large from Jefferson County.

12. No Black person was ever elected to the Jefferson County Commission under this structure.

13. In 1984, a federal lawsuit challenged the at-large election of the County Commission under Section 2 of the VRA. *See generally* Consent Decree, *Taylor v. Jefferson County Commission*, No. cv 84-c-1730-s (N.D. Ala., Aug. 17, 1985) (attached as "Exhibit A").

14. In August 1985, the parties settled the VRA litigation by consent decree. *Id*. At the time, Black residents of Jefferson County comprised about 33% of the total county population. Letter from Edwin A. Strickland, Cnty. Att'y, Jefferson Cnty. Comm'n to Asst Att'y Gen., Civ. Rts. Div., Dep't of Just. (Nov. 18, 1985) at 2 (attached as "Exhibit B"). Beginning with the November 1986 general election, the Consent Decree expanded the Commission from three to five

members, each elected from single-member districts within the county. *Id*. The Consent Decree established two majority-Black districts where Black voters would have an opportunity to elect candidates of choice to the Commission. Under the Consent Decree, Commission District 1 had a Black population of 65.6%, and Commission District 2 had a Black population of 66.8% based on the 1980 census. *Id*. at A-1, A-2. The Consent Decree does not require that the Black population percentages, nor the boundaries of the districts described therein must remain unchanged, nor that Districts 1 and 2 must maintain Black supermajorities.

15.     In accordance with the Consent Decree, since 1986, state law has required that the Commission be elected from five single-member districts within the County. Ala. Code § 45-37-72(b). Nothing in state law requires that the Commission maintain the Black population percentages or the boundaries of the districts described in the Consent Decree. *Id*. Commissioners serve four-year terms. *See* Ala. Code § 11-3-1(c).

16.     Under Alabama law, following the release of federal decennial census data, any county commission that elects its members from single-member districts may alter the boundaries of its districts. Ala. Code §§ 11-3-1.1(a), 45-37-72(b). County commissions are also authorized to establish precinct boundaries following the release of census data. Ala. Code § 17-6-2(a).

17.     All current Commissioners were present during the 2021 redistricting process, and all were reelected in the last election on November 8, 2022.

### **Background**

18.     According to the 2020 U.S. Census, Black people represent 42.91% of the total population and 41.46% of the voting-age population of Jefferson County. Hispanic people (regardless of race) are 5.17% of the total population and 4.29% of the voting-age population.

Non-Hispanic white people are 48.06% of the county's total population and 50.42% of the voting-age population.

19.     Since their creation in 1986, Jefferson County Commission Districts 1 and 2 have always elected Black candidates. The Black candidates elected from these districts in the last decade have won elections with over 65% of the vote in their districts.

20.     No Black candidates have ever won an election in supermajority-white Districts 3, 4, or 5.

21.     Although Jefferson County has a slim majority white voting-age population, Black and Black-preferred candidates have frequently won county-wide elections over the last decade. Despite Black candidates' success county-wide, Black candidates have never won election in the supermajority white Commission districts.

22.     Under the Enacted Plan (Figure 1), Black-preferred candidates will only win elections in Districts 1 and 2. The Enacted Plan, in its packing of Districts 1 and 2, strips Black voters from adjacent districts 3, 4, and 5 for the predominately racial motive of achieving certain racial targets in the Challenged Districts.

**Figure 1: Enacted Plan**

10

23.     The Enacted Plan (above), which shows the present lines in color (orange, yellow, green, red, and blue) and the old post-2010 districts under the black dotted line, has an any part Black population of 78.27% in District 1, 66.18% in CD 2, 27.29% in CD 3, 28.45% in CD 4, and 14.15% in CD 5. The Hispanic population in the Enacted Plan is 4.9% in CD 1, 5.94% in CD 2, 3.56% in CD 3, 6.8% in CD 4, and 4.6% in CD 5. The 2021 registered Black voter percentage was 79.51% in CD 1, 70.88% in CD 2, 24.93% in CD 3, 26.09% in CD 4, and 10.09% in CD 5.

### History of Discrimination by the Jefferson County Commission

24.     Jefferson County has had a long ugly history of racial discrimination that continues to this day.  Well into the 21st century, the county and its municipalities have devised schemes to strip Blacks residents of their voting power, deny Blacks residents needed healthcare, and re-segregate schools along racial lines.

25.     Theophilus Eugene "Bull" Connor, the infamous segregationist and violent opponent of the Civil Rights Movement and its leaders, served as a Commissioner on the Jefferson County Commission for 23 years, between 1937 and 1963. During this time, Bull Connor used his platform as Commissioner of Public Safety to, at times, violently enforce segregation ordinances in Jefferson County.

26.     For the last 40 years, Jefferson County has operated under a federal consent decree because of racial and sex discrimination in the hiring practices and promotions in various public service jobs in the county. The consent decree followed the filing of a complaint by the Ensley Branch of the NAACP and others against the County, the Personnel Board and the City of Birmingham alleging violations of Title VII of the Civil Rights Act. *United States v. Jefferson County*, No. 75-P-0666-S, 1981 WL 27018 (N.D. Ala. Aug. 18, 1981), *aff'd*, 720 F.2d 1511 (11th Cir. 1983). In January 1977, a federal court found that tests used by the county Personnel Board

11

"to screen and rank applicants for employment as police officers and firefighters discriminated against blacks and were not shown to be job related under criterion-related validity studies." *NAACP, Ensley Branch v. Seibels*, No. CA 74-2-12-S, 1977 WL 806 (N.D. Ala. Jan. 10, 1977). As recently as 2013, this Court granted the motion of the Black plaintiff class to hold the Commission in contempt due to the Commission's "thirty-year pattern of intentional, willful disobedience of this court's orders." *United States v. Jefferson Cnty.*, No. CV-74-S-17-S, 2013 WL 4482970, at *53 (N.D. Ala. Aug. 20, 2013); *see also id.* at *45. This Court specifically found that the Commission had "failed to fully appreciate the requirements of the decree, and the extent of the County's non-compliance," and adopted employment policies in 2011 and 2012 that "had resulted in adverse impact based on race and gender." *Id.* at 37–40. The final provisions of this consent decree expired only in 2022. *See United States v. Jefferson Cnty.*, No. CV-74-S-17-S, 2020 WL 13252315, at *2 (N.D. Ala. Dec. 21, 2020).

27.     In 2012, the Commission voted 3-2, with the two Black Commissioners opposing, to close inpatient care at Cooper Green Mercy Hospital, a hospital serving low-income, predominately Black residents. The City of Birmingham shortly thereafter filed a lawsuit against the Commission to force the county to keep Cooper Green open. During a Commission meeting days after the lawsuit was filed, protests erupted both inside and outside the Commission meeting, forcing the Commission to take no action on its proposed closure of inpatient care at Cooper Green Mercy Hospital. Then, two weeks later, the Commission voted 3-2 to close the inpatient care unit at Cooper Green, even after weeks of debate and protests from community leaders.

28.     The County discontinued inpatient and emergency room services in December 2012, reopening the facility in 2013 as an urgent care facility only. The Jefferson County Medical Society shortly thereafter issued a press release, stating that the Commission's efforts to downsize

Cooper Green Mercy Hospital were an "abject failure" and that primary care services for indigent Jefferson County residents had become non-existent.

29.     Municipalities in Jefferson County also have a persisting history of discrimination against Black residents. This includes selective annexations whereby all-white enclaves with a long history of discrimination against Black people sought to add white residents to their borders while refusing to incorporate Black residents for the purpose of weakening Black political power at the local level.

30.     In *City of Pleasant Grove v. United States*, the U.S. Supreme Court affirmed an Alabama District Court's denial of VRA Section 5 preclearance to two annexations sought by the City of Pleasant Grove on the ground that the city had engaged in a racially selective annexation policy. 479 U.S. 462 (1987). Pleasant Grove, at the time, was an all-white city in Jefferson County that had a long history of discrimination. The city sought preclearance to annex an area of white residents who wanted to attend the all-white Pleasant Grove school district instead of the desegregated Jefferson County school district, with its significant Black population, and to annex a parcel of land that the city planned to use to build housing that would likely be inhabited by white residents exclusively. *Id.* at 465–66. At the same time, the city refused to annex two predominantly Black areas of Jefferson County. *Id.* at 466–67. These majority Black neighborhoods form the borders of Commission Districts 1 and 2, which are separated from Commission District 3.

31.     The Supreme Court affirmed the finding "that the city had failed to carry its burden of proving that the two annexations at issue did not have the purpose of abridging or denying the right to vote on account of race." *Id.* at 467 (footnote omitted). The Court concluded that the city had intentionally sought to "provide for the growth of a monolithic white voting bloc[], thereby

effectively diluting the black vote in advance" of the then-anticipated growth of the city's Black population in the coming decades. *Id.* at 472.

32.     In *Alabama State Conference of the NAACP v. City of Pleasant Grove*, Black voters sued the City of Pleasant Grove under Section 2 and the Constitution to challenge the at-large method of electing the city council. 372 F.Supp.3d 1333 (N.D. Ala. 2019). Although at the time of the lawsuit, 44.8% of Pleasant Grove's population was Black, no Black candidate had ever been elected to the Pleasant Grove City Council. The lawsuit was settled late in 2019, and, as a result, the city agreed to change its method of voting to cumulative voting, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019), allowing the first Black commissioners ever to be elected from the city.

33.     Similarly, in 2017, Black residents challenged an attempt by the City of Gardendale, which was 85% white at the time, to form a school district separate from the County's more racially diverse school district. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988 (11th Cir. 2018). Secession leaders in Gardendale specifically sought to exclude Black children from North Smithfield/Greenleaf Heights from the municipal school system, claiming such "non-residents" drained resources from Gardendale Schools and derided the City of Center Point, a predominately Black community with no municipal school system that, before 2010, been predominately white, as an example of what could happen to the City of Gardendale if the community failed to act. *Id.* at 996. In 2018, the U.S. Court of Appeals for the Eleventh Circuit blocked Gardendale's secession from the county school district entirely and affirmed the district court's finding that Gardendale's attempted secession was motivated by intentional racial discrimination. *Id*. at 1010–13. The secession of Gardendale from the school district, beyond separating white students, teachers, and facilities from Black students, would have changed the method for electing board members governing the city schools. Prior to the secession, the city schools were controlled by the elected

14

county school board—on which Black voters had some representation. After the secession, the new board that controlled city schools would have been appointed by the Gardendale city council—which was all-white and elected at-large by the majority white city. This court found that Gardendale's city council had discriminated in refusing to appoint a well-qualified Black woman to the school board and ordered that, if the secession were to proceed, Gardendale must appoint a Black person to the city's school board. 250 F. Supp. 3d 1092, 1183 (N.D. Ala. 2017) *supplemented*, No. 2:65-CV-00396-MHH, 2017 WL 1857324 (N.D. Ala. May 9, 2017), and *aff'd in part, rev'd in part*, 882 F.3d 988 (11th Cir. 2018).

**The Process Leading to the Enactment of the Commission's 2021 Districting Plan**

34.     Alabama law requires each county to establish electoral districts composed of "contiguous, compact area[s] having clearly defined and clearly observable boundaries coinciding with visible features readily distinguishable on the ground such as designated highways, roads, streets, or rivers or be coterminous with a county boundary." Ala. Code § 17-6-2(b). Electoral districts should also conform to the most recent census tract and block map. Ala. Code § 17-1-2(19); *see* Commission Meeting, Jefferson County Commission at 17:40 (Nov. 4, 2021)[1] (statement of Barry Stephenson, Chair, Jefferson County Board of Registrars).

35.     Following the delayed release of the 2020 federal decennial census data, the Commission began its redistricting process in October 2021. The total population of Jefferson County, based on 2020 Census data, was 674,721, an increase of 2.2% since 2010 when the population was 658,466.

36.     The Commission worked with the Jefferson County Board of Registrars, including Board of Registrars Chair Barry Stephenson, in the redistricting process. Barry Stephenson hired

---

[1] https://jccal.new.swagit.com/videos/147366.

consultants Laura Foster and Laura Smith to develop a redistricting plan using geographic information system mapping software.

### The Commission's Redistricting Criteria

37.     On October 5, 2021, the Commission shared a PowerPoint with the public that outlined the redistricting process, listed the criteria the Commission planned to adhere to in the redistricting of the Commission, and showed the three redistricting plans that the Commission was considering for adoption. Citing *Reynolds v. Sims,* 377 U.S. 533 (1964), the County Commission's presentation on redistricting stated that they were bound by federal law to ensure near exact population equality amongst Commission Districts. Specifically, the County Commission sought to ensure that each Commission plan would fall within plus or minus 1% population variance. *See* Pre-Commission Work Session, Jefferson County Commission (Oct. 5, 2021).[2]

### The October 5, 2021 Work Session

38.     On October 5, 2021, the Commission met for a Pre-Commission Work Session. Commission President James "Jimmie" Stephens (District 3) presided over the work session. Commissioners Lashunda Scales (District 1), Sheila Tyson (District 2), Joe Knight (District 4), and Steve Ammons (District 5) were also in attendance.

39.     During the work session, Board of Registrars Chair Barry Stephenson gave a presentation on redistricting that provided an overview of the redistricting process and 2020 census data and described three redistricting plans the Commission was considering.  Pre-Commission Work Session, Jefferson County Commission, at 27:23 (Oct. 5, 2021) (statement of Barry Stephenson, Chair, Jefferson County Board of Registrars).[3]

---

[2] https://jccal.new.swagit.com/videos/141121?ts=1658.
[3] https://jccal.new.swagit.com/videos/141121?ts=1644.

40.    He stated that pursuant to Alabama law, the plans considered by the Commission would be drawn and adopted by the Commission, not the Board of Registrars, County Managers, or County Attorneys. *Id.* at 28:54–29:46; *see* Ala. Code. § 11-3-1.1(a).

41.    To achieve the Commission's equal population goal based on 2020 Census data, the Commission's population target for each of the five districts was 134,944 with a +/- 1% population variance.

42.    At the time the redistricting process began, the population of each Commission district based on 2020 census data was:

| | |
|---|---|
| **District 1** | 122,689 |
| **District 2** | 121,372 |
| **District 3** | 142,776 |
| **District 4** | 142,111 |
| **District 5** | 145,773 |

43.    Districts 1 and 2 were underpopulated by 9.1% and 10.1% respectively. Districts 3, 4, and 5 were overpopulated by 5.8%, 5.3%, and 8.0% respectively.

44.    To achieve the Commission's target population for each district, the Commission would need to increase the populations of Districts 1 and 2 by 12,255 and 13,572 people respectively, and decrease the population of District 3 by 7,832, District 4 by 7,167, and District 5 by 10,829.

45.     Three proposed redistricting plans were presented, that had the following populations by District:

|  | Plan 1 | Plan 2 | Plan 3 |
|---|---|---|---|
| **District 1** | 135,524 | 134,982 | 134,982 |
| **District 2** | 134,737 | 135,279 | 135,699 |
| **District 3** | 133,762 | 133,762 | 133,762 |
| **District 4** | 136,078 | 136,078 | 136,078 |
| **District 5** | 134,620 | 134,620 | 134,620 |

46.     All three plans would have packed Black voters into supermajority-Black Commission Districts 1 and 2.

47.     Commissioner Jimmie Stephens stated at the meeting that he believed the proposed plans were "uncontroversial" and that the Commission should be able to reach a decision in one month, by November 2021.

48.     As required by Alabama law, the Commissioners voted to make the proposed maps available for public viewing.

***The October 7, 2021 Commission Meeting***

49.     During its October 7, 2021, meeting, the Commission voted to conduct a public hearing on November 4, 2021, and to make all three redistricting proposals available for public inspection for two weeks prior to the public hearing. *See* Jefferson County Commission Resolution 2021-862 (Oct. 7, 2021)[4] (authorizing public hearing and publication of redistricting maps). Commissioners Knight, Stephens, and Scales approved the measure. Commissioner Tyson was absent from the meeting, and Commissioner Ammons was excused.

### The November 4, 2021 Public Hearing & Adoption of Enacted Plan

50.     On November 4, 2021, the Commission held the only public hearing on the proposed redistricting plans. All Commissioners were present at the November 4 public hearing.

51.     Board of Registrars Chair Barry Stephenson presented each of the three redistricting plans for consideration by the Commission. The presentation covered the population of each district under each plan and the changes to district boundaries, including which neighborhoods, municipalities, and regions were reapportioned to the 2021 districts.

52.     The Commission heard comments and concerns from the public regarding the redistricting proposals.

53.     After the public hearing concluded, Commission President Stephens invited the Commissioners to make statements.

54.     Commissioner Tyson (District 2) stated that Plan 1, the Enacted Plan, came from her office and staff. Commission Meeting, Jefferson County Commission at 54:51–55:04 (Nov. 4, 2021) (statement of Commissioner Sheila Tyson (CD1)).[5]

---

4

https://jeffersoncountyal.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=1356&MediaPosition=&ID=7924&CssClass=

[5] https://jccal.new.swagit.com/videos/147366?ts=3262.

55.     Commissioner Scales said that none of the proposed maps came from her office or her staff. *Id.* at 41:22–47:23 (statement of Commissioner Lashunda Scales (District 1)).

56.     After Commissioner Scales' remarks, Commissioner Ammons moved to adopt Plan 1. The motion was seconded by Commissioner Tyson. Commissioners Ammons, Knight, Tyson, and Stephens voted in favor of adopting Plan 1. Commissioner Scales voted against adopting Plan 1. The Commission approved what then became the Enacted Plan by a 4 to 1 vote. *See* Jefferson County Commission, Resolution 2021-929 (Nov. 4, 2021).[6]

57.     The Commission considered two plans that would have given District 2 more voters than District 1 by 297 people and 717 people, respectively, consistent with the Commission's stated goal of achieving near mathematical equality across Commission Districts. The map that was adopted, however, was drawn by the Commissioner for District 2 and overpopulated District 1 while selectively ensuring the voters added to District 2 were Black people. The result: the Enacted Plan had a population deviation of 1.73%. The Enacted Plan thus diverged more than the other two plans considered from the Commission's goal of near mathematical equality.

**Contemporaneous Statements and Actions of Key Commissioners**

58.     The Commissioners' racial motives in shifting Black voters around to maintain supermajority-minority districts were the central focus of the redistricting decisions discussed and made, although much of the negotiations surrounding the redistricting process and the plans proposed by the Commission occurred outside of public forum.

---

[6]https://jeffersoncountyal.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=1358&MediaPosition=&ID=7856&CssClass= (last visited Mar. 23, 2023).

59.     The Chair of the County Board of Registrars, Barry Stephenson, made clear that much of the negotiations around the maps had occurred between individual Commission members and the Board drawing the map, saying "You all have looked at the master map, and you have looked at areas where you needed to subtract from and where you needed to add to, and you've been working individually, not collectively, but individually, in coming together." Statement of Barry Stephenson at 37:34–37:53, 46:24–46:40 (Oct. 5, 2021).[7] Commissioner Scales seconded this lack of transparency in the public hearings on the proposed redistricting plans. November 4, 2021 Commission Meeting, Jefferson County Commission at 43:35–44:00 (statement of Commissioner Lashunda Scales (District 1)).[8]

60.     During the Commission meeting on November 4, 2021, Commissioner Scales also said, "I heard about numbers and equity . . . Plan 1 actually gives District 1 787 more citizenry than it does for District 2. Plan 2 gives District 2 297 more than District 1. Plan 3 would give District 2 [seven hundred and seventeen (717)] more than District 1." She pointed out that despite having the opportunity to vote for Plans 2 and 3, which would better achieve the Commission's redistricting goal of near mathematical equality in population across all Commission districts, the Commission voted to adopt Plan 1, which deviated from this goal.

61.     Commissioner Scales also indicated that Plan 1's over population of District 1 relative to District 2 had racial implications in that the neighborhoods included in District 2 under the Enacted Plan were not exclusively neighborhoods composed of Black people.

62.     She went on to say, "We speak of Democratic versus Republican… You figure out what that looks like." Her comments indicate that, even if she and the other Commissioners at

---

[7] https://jccal.new.swagit.com/videos/141121?ts=2254.
[8] https://jccal.new.swagit.com/videos/147366?ts=2615.

times used the term "Democratic" to describe particular neighborhoods included in the Districts, that was code for "Black" neighborhoods.

63.    The Commissioners could not have been looking at party registration when they identified which voters to add to Districts 1 and 2. Instead, the registered voter data that the Commission relied upon to draw the Enacted Plan showed only the race of voters in particular Census Blocks; not their party registration. The Alabama voter file does not contain voter registration by party. Alabama voters do not list or register by political party when registering to vote. Ala. Code §§ 17-4-33(a)(2), (4). However, the voter file does include the race/ethnicity of all voters. *Id*.

64.    The Commissioners could have looked at old election results in addition to race data in drawing the Enacted Plan, but older election results would have shown them that their districts did not need additional Black voters to perform for candidates preferred by Black voters. Indeed, such data would have shown that cracking majority-Black communities of interest and stripping Black voters based on race from Commission Districts 3, 4, and 5 would pack those districts with white voters and thereby deny Black voters the opportunity to elect candidates of their choice there.

65.    Commission President "Jimmie" Stephens said that he and the other Commissioners had inherited districts in 2010 that included "many fingers that stretched out in the different districts" and claimed to have "cleaned that up where all the district lines are smooth." Solomon Crenshaw Jr., *JeffCo Commissioners Begin Redrawing District Lines*, Birmingham Watch (Oct. 5, 2021).[9] Yet all of the maps actually proposed by the Commission began with the 2010 map as a baseline, and all added new tendrils to capture and separate Black communities

---

[9] https://birminghamwatch.org/jeffco-commissioners-begin-redrawing-district-lines/.

from white ones, splitting more voting districts, municipalities, and localities than necessary to achieve race-neutral districting principles.

## Deviations from Traditional Redistricting Principles

66.     The Commission's stated criterion for redistricting was equal population within 1% population variance, as indicated by the Commission's public presentation during the public hearing on the proposed plans. *See* Pre-Commission Work Session, Jefferson County Commission (Oct. 5, 2021), at 27:40.[10] This goal, however, was not mandated by federal law, as the Commission's presentation to the public implied. Federal law establishes "as a general matter, that an apportionment plan with a maximum population deviation under 10%" is presumptively constitutional. *Brown v. Thomson*, 462 U.S. 835, 842 (1983); *see also Gaffney v. Cummings*, 412 U.S. 735, 745–49 (1973).

67.     State guidelines emphasize that each county should establish compact electoral districts composed of "area[s] having clearly defined and clearly observable boundaries coinciding with visible features," Ala. Code § 17-6-2(b), including municipalities, towns, and other communities of interest. Ala. Code § 17-1-2(19). Similarly, the Supreme Court identifies "traditional race-neutral districting principles" as "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." *Miller*, 515 U.S. at 916. The Commission, however, did not seek to prioritize these traditional redistricting criteria. Rather, the Commission continued to use the 2010 map as a baseline,  even though the 2010 map split cities, towns, neighborhoods, and precincts for predominately racial reasons.  The Commission could have recognized that particular majority-Black towns or cities, like Birmingham or North Smithfield, are communities of interest and attempted to keep them whole. "A State is free to

---

[10] https://jccal.new.swagit.com/videos/141121?ts=1658.(Redistricting Presentation)

23

recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." *Id.* at 920. But there is no evidence that the Commission was attempting to accomplish this reasonable goal. Rather, the Commission split and divided these Black communities to maintain packed districts.

68. The only other redistricting criteria identified by the Commission comes from Alabama law which requires each county to establish precincts composed of contiguous and compact areas. Ala. Code § 17-6-2(b).

69. Before redistricting was undertaken, majority Black Districts 1 and 2 were underpopulated by 9.1% and 10.1% respectively, and Districts 3, 4, and 5 were over-populated by 5.8%, 5.3%, and 8.0% respectively. If the Commission's goal was primarily to achieve mathematical equality across Districts, District 1 should have had the most voters added to it, and Districts 3, 4, and 5 would not need any voters added to them.

70. The Enacted Plan, which was drawn by the Commissioner for District 2, underpopulated District 2 relative to District 1, unlike the other two plans proposed by the Commission. Even though population equality within plus or minus 1% was the only stated redistricting criteria for moving voters into or out of districts on the Commission and District 2 was the most underpopulated district based on the 2020 Census, Commissioners chose to prioritize adding specific Black voters to District 2 and not other non-Black voters, resulting in a deviation from the Commission's stated goal of exact population equality.

71. The result was that the Enacted Plan had a population deviation of 1.73%.

72. To inflate the BVAP percentages of Districts 1 and 2, the Enacted Plan intentionally lowered the BVAPs of adjacent, majority white, Districts 3 and 4, further ensuring the growing

24

Black populations there were frozen out of any opportunity to influence electoral outcomes in those districts.

73.    As a corollary, the Enacted Plan splits more political subdivisions, and municipalities than it keeps whole. It keeps only about 27 cities and towns whole, and splits 52 cities, towns, and unincorporated places (i.e., "communities of interest"). As discussed below, these splits were undertaken with surgical precision to place Black voters from Districts 3, 4, and 5 into Districts 1 and 2. Based on the Census Bureau's 2020 Voting Districts (VTD), the Enacted plan split 25 populated VTDs, and 57 total VTDs.

### Commission Districts 1, 2, 3, 4, and 5 are Racial Gerrymanders

74.    Race was the predominant factor motivating the drawing of Commission Districts 1, 2, 3, 4, and 5, and the Commissions' use of race was not narrowly tailored to comply with Section 2 of the VRA or any other compelling government interest. Race predominated the packing of Districts 1 and 2, as well as the stripping of Black voters from Districts 3, 4, and 5.

75.    The Commission ignored traditional redistricting principles like compactness, contiguity, and preserving precincts, political subdivisions and municipalities, while the Commission hid behind "background" principles like population equality, to allow race to predominate. In so doing, the Commission re-enacted contorted districts that capture far-flung Black populations in suburban portions of Birmingham to pack them into Districts 1 and 2 in the city of Birmingham, and cede Black voters from Districts 3, 4, and 5.

### A. Contorted Shapes

76.    The Enacted Plan has for two decades created contorted districts to allow Districts 1 and 2 to cover Black populations in central Birmingham while also reaching out and capturing more far-flung Black neighborhoods from the surrounding suburbs.

25



77.    District 1 stretches from Midfield up to Adamsville, carving out Black neighborhoods from District 3, before the District stretches back through central Birmingham and heads North to carve out Black populations in Center Point.

78.    Similarly, District 2 now stretches from Bessemer through parts of Homewood, grabbing the portions of Oxmoor and Rosedale with large Black populations.

79.    Districts 3 and 4 wrap around, in snakelike form, Districts 1 and 2. District 4 reaches down to capture parts of Irondale, snakes back up to Pinson, and then back down through Fultondale to Tarrant. District 3 snakes from Mount Olive and West Jefferson down to capture parts of Hueytown before heading back up again to capture portions of Hoover.

### B. Non-Compactness

80.    The districts in the Enacted Plan are necessarily non-compact. A district is likely to have a higher Polsby-Popper score (indicating more compactness) if it has smooth borders. Polsby-

Popper measures compactness on a scale from 0 to 1, with 1 being the most compact and 0 being the least compact. The Challenged Districts have the following Polsby Popper scores:

| District | Polsby-Popper Score |
|---|---|
| 1 | .12 |
| 2 | .23 |
| 3 | .18 |
| 4 | .20 |
| 5 | .22 |

81.    The Challenged Districts all have low compactness scores, with serpentine Districts 1 and 3 having the lowest Polsby-Popper scores, followed closely by Districts 4, 5, and 2.

*C. Splintering Precincts, Towns, Municipalities, and Neighborhoods on the Basis of Race*

82.    *District 1*:  Race was the predominant factor motivating the drawing of District 1, and it was not employed in a manner narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. District 1 has a visually bizarre, flattened "Z" shape attributable only to racial predominance. This strange zig-zagging shape and the jagged lines of the District intersecting with Districts 3 and 4 result in District 1's extremely low compactness score.

83.    District 1 has a BVAP of 76.34%. About 13,000 individuals were moved into District 1 in the Enacted Plan, of whom about 10,000 (77.46%) were Black residents and 2,000 (16.11%) were non-Hispanic white residents. The Enacted Plan splinters Black neighborhoods in

27

Irondale into District 1, while siphoning the white populations in Irondale into Districts 4 and 5. Likewise, the population in Center Point is split along racial lines between Districts 1 and 4.

84.     *District 2*: Race was the predominant factor motivating the drawing of District 2, and it was not employed in a manner narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. District 2 has a BVAP of 64.11%. About 13,600 individuals were moved into District 2 in the Enacted Plan. About 5,600 of the individuals who were moved into the District under the Enacted Plan (41%) were Black. As discussed above, specific Black neighborhoods were selected for inclusion in District 2, splitting these neighborhoods and individuals between adjacent Districts 5 and 3 on the basis of race.

85.     *District 3*: Race was the predominant factor motivating the drawing of District 3, and it was not employed in a manner narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. District 3 has a visually bizarre, contorted "E" shape attributable to racial predominance in the line drawing of the District. The three points of the E stick out to carve white neighborhoods and municipalities from areas otherwise dominated by Districts 1 and 2, which the District partially surrounds. Under the Enacted Plan, selective portions of the residents of Homewood were moved out of District 3 based on their race, including the predominately Black neighborhoods of Oxmoor and Rosedale.

86.     District 3 has a BVAP of 25.80%. About 1,600 individuals were moved into District 3. About 1,400 (87.84%) of the individuals who were moved into the District under the Enacted Plan were white people, and 85 (5.32%) were Black people. About 30 Black residents and 102 white residents were added to District 3 under the Enacted Plan came from District 1, the most underpopulated District. Nearly 1,500 white residents from District 4, an overpopulated District, were added to District 3.

87.    *District 4*: Race was the predominant factor motivating the drawing of District 4, and it was not employed in a manner narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. District 4 has a visually bizarre, contorted shape, that like District 3, also resembles an "E" shape, which is attributable to racial predominance in the line drawing of the District. The three points of the District 4 "E" include jutting edges that cut into Irondale, Center Point, and Fultondale, splitting these neighborhoods, which are Census Places, between District 4 and District 1.

88.    District 4 has a BVAP of 25.74%. About 4,800 individuals were moved into District 4 in the Enacted Plan, of whom about 3,900 (80.68%) were white people. Almost all the persons added to District 4 (4,787 individuals) were white residents from District 5, another overpopulated District. This allowed a primarily Black population from District 4 to be added to District 1: of the 9,409 voters added to District 1 from District 4 under the Enacted Plan, 7,777 were Black people, and 1,088 were white people. The Enacted Plan splits Irondale between Districts 1, 4, and 5, splintering the Black community in Irondale primarily into District 1, rendering the Black communities in Districts 4 and 5 ineffectively low in population to achieve their shared interests.

89.    *District 5*: Race was the predominant factor motivating the drawing of District 5, and it was not employed in a manner narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. District 5 has a BVAP of just 13.99%. No residents were added to District 5; population was exclusively moved out of District 5, principally into Districts 4 and 2. Although District 4 was overpopulated based on the 2020 census, nearly 5,000 residents were added to the District from District 5: about 3,900 white residents and 400 Black residents. Moving white population from District 5 into District 4 allowed for the removal of roughly 1,400 Black residents from District 5 into District 2. The Enacted Plan splits Homewood

between Districts 2 and 5, carving out the Black neighborhoods of Oxmoor and Rosedale to place these Black residents into District 2.

**Lack of Narrow Tailoring to Achieve a Compelling Interest**

90.     Because race was the predominant motive in creating the Enacted Plan's districts, strict scrutiny applies, and the burden shifts to the government to demonstrate that the districting plan it enacted is narrowly tailored to serve a compelling governmental interest in order to survive constitutional muster. *See Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (citing *Bush v. Vera*, 517 U.S. 952, 962 (1996)).  Compliance with § 2 of the VRA can be a compelling state interest. *Vera*, 517 U.S. at 977; *Miller*, 515 U.S. at 921.

91.     When a State invokes the VRA to justify race-based districting, "it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Cooper*, 581 U.S. at 292–93 ("the State must establish that it had 'good reasons' to think that it would transgress the Act if it did not draw race-based district lines."). The "strong basis" standard gives States "breathing room" to adopt reasonable compliance measures. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) ("*ALBC*").

92.     Section 2 of the VRA prohibits the use of any voting practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority. 52 U.S.C. § 10301(a); *Thornburgh v. Gingles*, 478 U.S. 30, 43 (1986). In the absence of extreme racial polarization, nothing in the VRA requires the packing of Black voters or any other minority group such that they constitute an excessive majority in a particular district. In fact, the voting strength of a politically cohesive minority group can be diluted either "by fragmenting the minority voters among several districts where a bloc-voting

30

majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." *De Grandy*, 512 U.S. at 1007.

93.     Moreover, the VRA requires legislative bodies to identify "[t]o what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice." *ALBC*, 575 U.S. at 279. A legislative body that seeks only to "maintain present minority percentages in majority-minority districts" without inquiring whether present circumstances still require such percentages has not adopted a reasonable compliance measure that is narrowly tailored to justify its race-based decision-making. *Id.*

94.     Upon information and belief, the Commission never requested nor conducted an analysis of RPV in each district or were seeking to comply with the VRA at all. And nothing in the electoral behavior of the voters in Districts 1 or 2 nor in the County as a whole gave the Commissioners cause to believe packing Black voters in Districts 1 and 2 was necessary to ensure that the districts remained majority Black.

95.     Given the continued existence of RPV in Jefferson County, *Jones v. Jefferson County Board of Education*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2–3 (N.D. Ala. Dec. 16, 2019), and across Alabama, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1016–17(N.D. Ala. 2022), *order clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), and *appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, No. 22-10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), the Commission could have concluded that majority Black districts continue to be necessary to ensure non-dilution of Black voting strength in Jefferson County. The Commission could have also concluded, however, that the success of Black-preferred candidates in recent county-wide elections and recent elections in single-member districts with Black pluralities meant that the packed supermajority districts created in 1986 were no longer

necessary. *See, e.g.*, *Jones*, 2019 WL 7500528, at *2, *5 (noting that "Black candidates won narrow countywide elections despite sharply polarized voting by race" and devising a remedial plan that included two crossover opportunity districts). The Commission did not need to maintain two supermajority Black districts nor to deviate from traditional redistricting criteria for predominately racial reasons to accomplish the goal of maintaining at least two districts where Black voters have an equal opportunity to elect candidates of their choice.

96.     Had the Commission conducted an RPV study or similar analysis, the Commissioners would have known that their districts would continue to elect Black-preferred candidates with a significantly lower BVAP than the districts had under the 2010 plan.

97.     By stripping Black voters from Districts 3, 4, and 5, the Commission ensured that Black voters in these districts were kept unnecessarily low, rendering their voice ineffective in elections in these districts.

98.     Eric Burks, the Jefferson County Assistant Tax Collector (2020), Gaynell Hendricks (2020), the County Tax Assessor, and Eyrika Parker (2020), the County Treasurer, were Black and Black-preferred candidates who were elected at-large from Jefferson County.

99.     In 2022, Stephanie Floyd, a Black and Black-preferred candidate, won her election from a 45% Black single-member district for the Jefferson County Board of Education. Ms. Floyd, a Black and Black-preferred candidate, won the election to the School Board with 62% of the vote.

100.     Here, therefore, there was no "strong basis in evidence," to conclude that vote dilution, in violation of VRA § 2, would occur in the absence of the supermajority Black districts the Commission created in Districts 1 and 2. *Shaw I*, 509 U.S. at 656 (internal quotation marks and citation omitted).

**CLAIM FOR RELIEF**

**Count One**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV**
**(Racial Gerrymandering)**

101.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

102.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

103.    Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is subject to strict scrutiny and is prohibited unless it is narrowly tailored to serve a compelling state interest.

104.    Where race is the predominant factor in the government's decision-making, strict scrutiny is triggered, and "[t]he burden . . . shifts to the [government] to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 581 U.S. at 292 (internal quotation marks omitted). Compliance with VRA Section 2 has served as the primary justification for considerations of race to predominate permissibly in the redistricting process. *See Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 915 (1996); *Clark v. Putnam Cnty.*, 293 F. 3d 1261, 1273–74 (11th Cir. 2002).

105.    As alleged in detail above, race was the predominant factor in the drawing of Jefferson County Commission Districts 1, 2, 3, 4, and 5.

106.    Race predominated over the County's stated redistricting goals of equal population as well as over traditional redistricting principles such as maintaining communities of interest and respecting county and municipal boundaries.

107.    The use of race as the predominant factor in creating Districts 1, 2, 3, 4, and 5 was not narrowly tailored to advance any compelling interests, including compliance with the VRA, because the racial targets chosen by the Commissioners for those districts was not necessary for Black-preferred candidates to prevail.

108.    Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause.

109.    Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the 2021 Enacted Plan will irreparably harm Plaintiffs' constitutional rights by forcing them to vote in districts drawn on the basis of race for the next decade.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the challenged districts to be unconstitutional as violating the Fourteenth Amendment to the United States Constitution as racial gerrymanders;

B.    Permanently enjoin the Defendants and their agents from using the racially gerrymandered map adopted in the 2021 redistricting cycle and require the Defendants to remedy the constitutional violations;

C.    Set an immediate and reasonable deadline for the Jefferson County Commission to adopt and enact a constitutional districting plan that does not sort Alabamians on the basis of race without sufficient justification, ends the packing of Black people into supermajority-Black Commission Districts 1 and 2, and does not strip Black people from Commission Districts 3, 4, and 5;

D.      Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this lawsuit pursuant to and in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b);

E.      Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

F.      Grant such other and further relief as the Court may deem just and proper.


DATED this 7th day of April 2023.

By: **NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**

Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
nlawsen@wigginchilds.com

/s/ *Kathryn Sadasivan*
Kathryn Sadasivan (ASB-5178E48T)
Brittany Carter*
Uruj Sheikh*
40 Rector Street, 5th Fl.
New York, NY 10006
Tel: (212) 965-2200
Fax (202) 226-7592
ksadasivan@naacpldf.org
bcarter@naacpldf.org
usheikh@naacpldf.org

Deuel Ross*
700 14th St. NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax (202) 682-1312
dross@naacpldf.org


*Attorneys for Plaintiffs*
**Pro Hac Vice application forthcoming*

35