FILED

2023 Aug-11 PM 07:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| CARA MCCLURE, et al., | |
| *Plaintiffs*, | No. 2:23-cv-00443-MHH |
| v. | **(ORAL ARGUMENT REQUESTED)** |
| JEFFERSON COUNTY COMMISSION, et al., | |
| *Defendants*. | |
| ALEXIA ADDOH-KONDI, et al., | No. 2:23-cv-00503-MHH |
| *Plaintiffs,* | |
| v. | |
| JEFFERSON COUNTY COMMISSION, et al., | |
| *Defendants,* | |

## DEFENDANTS' RESPONSE TO McCLURE & ADDOH-KONDI PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction .......................................................................................... 1

Background .......................................................................................... 2

Standard of review ............................................................................... 9

Argument ........................................................................................... 11

  I.  The Balance of Harms Weighs Decidedly Against Plaintiffs ....................... 11

    A.  Plaintiffs Cannot Establish Irreparable Harm Given Their Delay ......... 11

    B.  The Harm and Confusion Resulting from Irregular Elections Outweighs Plaintiffs' Alleged Harm ...................................................... 15

  II.  A "Special Mid-Term Elections" Remedy Would Be Unprecedented .......... 18

    A.  Special Elections Do Not Preserve the Status Quo ............................... 18

    B.  Special Elections Are Not Appropriate Preliminary Relief .................... 19

  III.  Plaintiffs Cannot Establish Likelihood of Success on the Merits ................. 28

    A.  Addoh-Kondi Plaintiffs Disclaim Discriminatory Purpose. ................. 29

    B.  Addoh-Kondi Plaintiffs' Illustrative Plans Are Examples of Alternative Policy Choices, Not Proof of Discriminatory Purpose ........ 31

    C.  McClure Plaintiffs Cannot Equate Maintaining Existing Lines with Discriminatory Purpose ........................................................................ 33

    D.  McClure Plaintiffs' Allegations Regarding the 2021 Redistricting Do Not Establish Racial Predominance .................................................. 37

    E.  Plaintiffs Cannot Succeed on a Theory that the Commission Should Have Done *More* to Move Voters on the Basis of Race ......................... 47

Conclusion ......................................................................................... 50

Certificate of Service ......................................................................... 51


Declaration of Barry Stephenson and Exhibits ........................... Exhibit 1

Declaration of James P. Naftel, II and Exhibits........................... Exhibit 2

Declaration of Keith Harris ......................................................... Exhibit 3

2021 Enacted Plan ....................................................................... Exhibit 4

*Chandler* Scheduling Order ........................................................ Exhibit 5

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)..........................................................30, 35, 50

*Abrams v. Johnson*,
   521 U.S. 74 (1997)...............................................................34

*Adamson v. Clayton Cnty. Elections Reg. Bd.*,
   876 F. Supp. 2d 1347 (N.D. Ga. 2012) ..............................24

*Alabama v. United States Dep't of Commerce*,
   546 F. Supp. 3d 1057 (M.D. Ala. 2021)..............................11

*ALBC v. Alabama*,
   231 F. Supp. 3d 1026 (M.D. Ala. 2017)..........................43, 45

*ALBC v. Alabama*,
   575 U.S. 254 (2015).............................................................42

*Allen v. Milligan*,
   143 S. Ct. 1487 (2023).......................................................34, 36

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)..............................................................25

*Bell v. Southwell*,
   376 F.2d 659 (5th Cir. 1967).............................................14, 25

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018).......................................................passim

*Bethune-Cookman Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, 2023 WL 3704912 (11th Cir. May 30, 2023)....................14

*Bethune-Cookman Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 6:22-cv-477-WWB-DAB,
   2022 WL 18107602 (M.D. Fla. Nov. 22, 2022)...................14

*Bethune-Hill v. Va. State Bd. of Elections*,
   326 F. Supp. 3d 128 (E.D. Va. 2018) ................................44

*Bethune-Hill v. Va. State Bd. of Elections*,
   368 F. Supp. 3d 872 (E.D. Va. 2019) ................................43

*Bethune-Hill v. Virginia State Bd. of Elections*,
   580 U.S. 178 (2017)...........................................................passim

*Bowes v. Ind. Sec'y of State*,
   837 F.3d 813 (7th Cir. 2016) ................................................................19

*Burton v. Hobbie*,
   561 F. Supp. 1029 (M.D. Ala. 1983)..............................22, 23, 24, 26

*Bush v. Vera*,
   517 U.S. 952 (1996)...............................................................................49

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995) ...................................................................13

*Chestnut v. Merrill*,
   377 F. Supp. 3d 1308 (N.D. Ala. 2019) .............................................50

*Clark v. Putnam Cnty.*,
   293 F.3d 1261 (11th Cir. 2002) ...........................................................42

*Coal. for Edu. in District One v. Bd. of Elections of City of N.Y.*,
   370 F. Supp. 42 (S.D.N.Y. 1974) ..................................................14, 25

*Cook v. Luckett*,
   735 F.2d 912 (5th Cir. 1984) ................................................................19

*Cosner v. Dalton*,
   522 F. Supp. 350 (E.D. Va. 1981) .................................................23, 24

*Covington v. North Carolina*,
   270 F. Supp. 3d 881 (M.D.N.C. 2017)................................................22

*Covington v. North Carolina*,
   316 F.R.D. 117 (M.D.N.C. 2016)..........................................................42

*Dees v. Peters*, No. 2:21-cv-392,
   2022 WL 894609 (N.D. Ala. Feb. 22, 2022).......................................19

*Easley v. Cromartie*, 532 U.S. 234 (2001) .......................................passim

*Georgia State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015) ...............................................25

*Goosby v. Town Bd. of Town of Hempstead*,
   180 F.3d 476 (2d Cir. 1999) .................................................................23

*Greater Birmingham Ministries v. Sec'y of State*,
   161 F. Supp. 3d 1104 (N.D. Ala. 2016)................................................19

*Greater Birmingham Ministries v. Sec'y of State*,
   992 F.3d 1299 (11th Cir. 2021) ........................................40, 41, 43, 50

*Griffin v. Burns*,
  570 F.2d 1065 (1st Cir. 1978) ........................................................................14, 25

*Hadnott v. Amos*,
  394 U.S. 358 (1969)........................................................................13, 23, 25

*Holland v. Florida*,
  560 U.S. 631 (2010)........................................................................25

*Jacksonville Branch of NAACP v. City of Jacksonville*,
  2023 WL 119425 (11th Cir. Jan. 6, 2023) ........................................................................30

*Jacksonville Branch of NAACP v. City of Jacksonville*,
  635 F. Supp. 3d 1229 (M.D. Fla. 2022) ........................................................................12, 36

*Johnson v. DeGrandy*,
  512 U.S. 997 (1994)........................................................................33, 47

*Johnson v. Gov. of State of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ........................................................................50

*Karcher v. Daggett*,
  462 U.S. 725 (1983)........................................................................34

*Ketchum v. City Council of City of Chicago*,
  630 F. Supp. 551 (N.D. Ill. 1985) ........................................................................22

*Large v. Fremont Cnty.*, No. 05-cv-270,
  2010 WL 11508507 (D. Wyo. Aug. 10, 2010) ........................................................................25, 26

*League of Women Voters v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ........................................................................35, 40, 41

*League of Women Voters v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) ........................................................................35, 40, 41

*Lee v. City of Los Angeles*,
  908 F.3d 1175 (9th Cir. 2018) ........................................................................41

*Lyles v. Hale Cnty. Comm'n*, No. 04-711-CG-M,
  2005 WL 8158888 (S.D. Ala. Oct. 17, 2005) ........................................................................20

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998) ........................................................................10

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022)........................................................................15

*Miller v. Bd. of Comm'rs of Miller Cnty.*,
  45 F.Supp. 2d 1369 (M.D. Ga. 1998)........................................................................49

*Miller v. Johnson*,
515 U.S. 900 (1995)................................................................29, 32, 47

*Missouri v. Jenkins*,
515 U.S. 70 (1995)................................................................................48

*MLP v. Bibb Cnty. Bd. of Educ.*, No. 7:21-CV-1258-LSC,
2021 WL 9668206 (N.D. Ala. Sept. 17, 2021) ....................................14

*Mobile v. Bolden*,
446 U.S. 55 (1980)................................................................................28

*Montiel v. Davis*,
215 F. Supp. 2d 1279 (S.D. Ala. 2002) ..........................................34, 40

*Navajo Nation v. San Juan County*, No. 2:12-cv-00039,
2017 WL 6547635 (D. Utah Dec. 21, 2017)............................12, 22, 25

*Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) ...........................................9, 10, 18, 20

*North Carolina v. Covington*,
138 S. Ct. 2548 (2018).............................................................30, 34, 42

*North Carolina v. Covington*,
581 U.S. 486 (2017)......................................................................passim

*Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV,
2017 WL 532299 (S.D. Fla. Feb. 9, 2017)............................................14

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)........................................................................32, 48

*Parks v. City of Warner Robins*,
43 F.3d 609 (11th Cir. 1995) ...............................................................30

*Personnel Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979)........................................................................28, 43

*Pippin v. Playboy Entm't Grp., Inc.*, No. 8:02-cv-2329-T-30,
2003 WL 21981990 (M.D. Fla. July 1, 2003)......................................15

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..................................................................................15

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020).........................................................................15

*Reynolds v. Sims*,
377 U.S. 533 (1964).................................................................12, 15, 34

*Robinson v. Attorney General*,
   957 F.3d 1171 (11th Cir. 2020) .....................................................................10, 18

*S. C. State Conf. of the NAACP v. Alexander*, No. 3:21-cv-3302,
   2023 WL 118775 (D.S.C. Jan. 6, 2023) ................................................................43

*Shaw v. Hunt*,
   517 U.S. 899 (1996)...........................................................................................29, 31

*Shaw v. Reno*,
   509 U.S. 630 (1993)...........................................................................................28, 32

*Shelby Cnty. v. Holder*,
   570 U.S. 529 (2013)...................................................................................................3

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996) ............................................................................24

*Snider Tire, Inc. v. Chapman*, No. 2:20-cv-1775-AMM,
   2021 WL 2497942 (N.D. Ala. Apr. 27, 2021).......................................................14

*Students for Fair Admissions, Inc. v. Pres. & Fell. of Harv. Coll.*,
   143 S. Ct. 2141 (2023) ......................................................................................32, 48

*Tucker v. Burford*,
   603 F. Supp. 276 (N.D. Miss. 1985) .......................................................................23

*United States v. City of Houston*,
   800 F. Supp. 504 (S.D. Tex. 1992).........................................................................20

*United States v. Osceola Cnty.*,
   474 F. Supp. 2d 1254 (M.D. Fla. 2006) ..................................................................24

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981)...................................................................................20, 21, 28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)................................................................................................28

*Walters v. Bos. City Council*, No. 22-12048,
   2023 WL 3300466 (D. Mass. May 8, 2023) ..........................................................41

*White v. Daniel*,
   909 F.2d 99 (4th Cir. 1990) ....................................................................................50

*White v. Weiser*,
   412 U.S. 783 (1973)................................................................................................34

*Willard v. Baldwin Cnty. Bd. of Edu.*, No. 09-406,
   2009 WL 10704886 (S.D. Ala. 2009) ....................................................................13

*Williams v. City of Dallas*,
  734 F. Supp. 1317 (N.D. Tex. 1990) ...................................................24

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .........................................................................9

*Wis. Legis. v. Wis. Elections Comm'n*,
  142 S. Ct. 1245 (2022) ..............................................................47, 49

*Wise v. Lipscomb*,
  437 U.S. 535 (1978) .......................................................................26

*Wood v. Raffensperger*,
  501 F. Supp. 3d 1310 (N.D. Ga. 2020) ...............................................13

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ...................................11, 13, 14, 18

*Wright v. Sumpter County Board of Elections*,
  361 F. Supp. 3d 1296 (M.D. Ga. 208)....................................12, 22, 24

## Statutes

Ala. Code § 11-3-1 ...........................................................................26

Ala. Code §11-3-1.1 .........................................................................3, 9

Ala. Code §45-37-72 ..........................................................................3

## Other Authorities

11A Charles Alan Wright, et al.,
  Federal Practice and Procedure §2948.1 (2021) ...................................13

## INTRODUCTION

In November 2021, the Jefferson County Commission redistricted its five electoral districts. Plaintiffs did not sue. By early 2022, the next regularly scheduled elections for County Commissioners were set to proceed. Plaintiffs did not sue to stop them. And when Jefferson County voters re-elected their Commissioners to four-year terms in November 2022, Plaintiffs did not sue. It was not until April 2023 that Plaintiffs filed their complaints alleging that the districts violated the Equal Protection Clause. *See* Addoh-Kondi Compl., ECF 1;[1] McClure Compl., ECF 1. The complaints did not raise the possibility of special elections or other preliminary relief. *See* Addoh-Kondi Compl. 20-21, ECF 1; McClure Compl. 34-35, ECF 1. It was not until July 2023—now twenty months after redistricting and eight months after the November 2022 elections—that Plaintiffs moved for preliminary injunctions.

Plaintiffs' motions do not ask for a preliminary remedy preserving the status quo. They instead seek the extraordinary remedy of shortening Commissioners' four-year terms to two years and holding court-ordered "special mid-term elections" pursuant to new district lines in 2024, instead of the next regularly scheduled elections in 2026. Addoh-Kondi Br. 1, ECF 21; *see* McClure Br. 1, ECF 26-1. Such extraordinary relief is irreconcilable with Plaintiffs' delay and would be

---

[1] Docket numbers for Addoh-Kondi Plaintiffs' complaint and preliminary injunction motion refer to Addoh-Kondi Plaintiffs' docket, No. 2:23-cv-503-MHH (N.D. Ala.), where Addoh-Kondi Plaintiffs filed both. All other ECF numbers refer to the McClure docket, No. 2:23-cv-443-MHH.

unprecedented as a preliminary injunction remedy. The U.S. Supreme Court "has never addressed whether or when a special election may be a proper remedy for a racial gerrymander" as part of a final judgment, *North Carolina v. Covington*, 581 U.S. 486, 488 (2017), let alone a preliminary injunction remedy. Defendants are aware of no case in which a federal court shortened elected officials' terms and ordered irregular elections in analogous circumstances. And here, Plaintiffs' delay has rendered such relief unavailable. With the likely time remaining after a ruling, the County could not responsibly administer elections for all five commissioners pursuant to new district lines as part of the 2024 elections. *See* Ex. 1, Stephenson Dec. ¶51, ECF 31; Ex. 2, Naftel Dec. ¶29 ECF 32; Ex. 3, Harris Dec. ¶20, ECF 33. Plaintiffs' preliminary injunction motions should be denied, allowing these cases to proceed along a reasonable schedule with sufficient time to prove and defend against Plaintiffs' claims. Having failed to file their motions before the 2022 elections, Plaintiffs cannot now obtain preliminary injunctive relief based on arguments that the 2026 elections are too far away.

## BACKGROUND

**I.** Nearly forty years ago, a group of plaintiffs challenged the Jefferson County Commission's system of at-large elections as a violation of the Voting Rights Act. *See Taylor v. Jefferson County Comm'n*, No. 84-C-1730-S (N.D. Ala). The litigation ended in a consent decree, establishing five single-member districts including two

majority-Black districts covering most of Birmingham. *See* Addoh-Kondi Compl. ¶32, ECF 1; Compl. Ex. 1, ECF 1-1; *see also* Ala. Code §45-37-72.

Since the *Taylor* consent decree, the Commission has updated district lines after every census to adjust for population changes. *See* Ala. Code §11-3-1.1. The U.S. Department of Justice precleared adjustments to the districts pursuant to Section 5 of the Voting Rights Act in the 1980s, 1990s, 2000s, and 2010s. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013) (describing preclearance requirements).

Then again following the 2020 Census, the Commission adjusted district lines to account for slight population changes and adopted the "Enacted Plan" in November 2021. *See* Ex. 1, Stephenson Dec. ¶14, ECF 31 & Ex. A, ECF 31-1 (comparing 2011 and 2021 district lines); Ex. 4, 2021 Enacted Plan, ECF 34. Underpopulation in Districts 1 and 2 required those district boundaries to expand slightly, but the 2021 Enacted Plan generally abided by the existing district lines. *See* Ex. 1, Stephenson Dec. Ex. B, ECF 31-2. The plan kept roughly 95 percent of Jefferson County voters in their same district. *Id*. ¶22.

The particular adjustments to districts are described in the attached declaration from the Chairman of the Board of Registrars, Barry Stephenson, who facilitated the redistricting process for the Commission with the Board's GIS software. *See* Ex. 1, Stephenson Dec. ¶12, ECF 31. District 1 gained needed population by adding areas of Dolomite, Center Point, and McDonald's Chapel to the district. *Id.* ¶25. District

2 gained needed population by adding areas from Bessemer, Oxmoor Valley, Home-wood, and Unincorporated Jefferson County. *Id.* ¶27. Areas like Center Point and Homewood were not fully subsumed into Districts 1 and 2, respectively, because their larger populations would have left the districts overpopulated without then making other major changes to them. *Id.* ¶¶26, 28, 29. Other slight changes were made in the Enacted Plan, for example shifting the line separating Districts 3 and 4 from a creek to the Interstate and moving a small area from District 1 to District 3, allowing voters to avoid voting at multiple locations and getting the voters closer to their precinct. *Id.* ¶¶30-31.

Even though the district lines have remained mostly the same, the de-mographics of the districts have changed over time in part due to population changes. According to census data from the Board of Registrars, the multiracial population in all districts increased; the white population decreased in all districts except District 2 (where it increased by roughly 5%); and the Black population increased in all dis-tricts except District 2 (where it decreased by roughly 9%):

| District | Total Population | White Population | Black Population | Multiracial Population |
|---|---|---|---|---|
| District 1 | 135, 524 (+0.43% of ideal) | 21,226 / 15.7% (-3.8% from 2011) | 103,662 / 76.5% (+0.4% from 2011) | 10,636 / 7.8% (+3.4% from 2011) |
| District 2 | 134,737 (-0.15% of ideal) | 33,190 / 24.6% (+5.2% from 2011) | 86,861 / 64.5% (-8.9% from 2011) | 14,686 / 10.9% (+3.8% from 2011) |
| District 3 | 133,762 (-0.88% of ideal) | 85,891 / 64.2% (-8.3% from 2011) | 35,099 / 26.2% (+3.3% from 2011) | 12,772 / 9.5% (+5.0% from 2011) |
| District 4 | 136,078 (+0.84% of ideal) | 83,081 / 61.1% (-7.8% from 2011) | 36,840 / 27.1% (+2.0% from 2011) | 16,157 / 11.9% (+5.8% from 2011) |
| District 5 | 134,620 (-0.24% of ideal) | 100,864 / 74.9% (-3.2% from 2011) | 17,650 / 13.1% (+1.5% from 2011) | 16,106 / 12.0% (+1.7% from 2011) |

*Ex. 1, Stephenson Dec. ¶24, ECF 31 & Ex. C, ECF 31-3*

At the public hearing, no one challenged the plan as a racial gerrymander, and no one said that district lines needed to remain the same for race-based reasons. *See* Ex. 1, Stephenson Dec. ¶¶17-19, ECF 31.[2] Various Commissioners acknowledged their policy preference to keep districts the same, commenting that "no one really likes to change" and "we don't want to really give up people."[3] Mr. Stephenson testified from the Board of Registrars, as well as six members from the public who spoke about the importance of population equality and whether Ensley and other neighborhoods should remain in their existing districts or be moved.[4]

**II.** More than seventeen months after the Commission approved the adjusted lines, the Plaintiffs filed separate suits in April 2023. Their complaints each claim that the Enacted Plan violates the Equal Protection Clause. Addoh-Kondi Compl. ¶¶52-61, ECF 1; McClure Compl. ¶¶101-09, ECF 1. Neither complaint requested preliminary relief or "special" elections to shorten current Commissioners' terms. *See* Addoh-Kondi Compl. 20; McClure Compl. 34-35, ECF 1.

Defendants have moved to dismiss each of Plaintiffs' complaints. ECF 19, 20.

---

[2] *See also* Oct. 5, 2021 Pre-Commission Work Session, Jefferson County Alabama, https://jccal.new.swagit.com/videos/141121 (McClure PI Ex. F, ECF 31-2); Nov. 4, 2021 Commission Meeting, https://jccal.new.swagit.com/videos/147366 (McClure PI Ex. D, ECF 31-1).

[3] Nov. Hearing Tr. 35:22-36:1, 45:8-10, McClure PI Ex. D, ECF 31-1; *see also id.* 25:2-3, 34:15-19, 38:6-8, 45:24-25.

[4] *See, e.g.*, *id.* at 11:20-18:22 (Stephenson testimony); *id.* at 20:12-14, 20:25-25:4 (population equality); *id.* at 21:12-22:6, 23:17-24:4, 29:2-6 (discussing proposed Plan 1 versus Plan 2).

**III.** Three months after filing their complaints, eight months after the November 2022 elections, and twenty months after the redistricting resolution passed, Addoh-Kondi Plaintiffs filed a preliminary injunction motion on July 6, 2023. ECF 20. McClure Plaintiffs filed a preliminary injunction motion on July 21, 2023. ECF 26. Plaintiffs' motions ask the Court to order irregular elections in 2024, cutting short current Commissioners' four-year terms, if the Court concludes Plaintiffs are likely to succeed on the merits. Addoh-Kondi Br. 1, ECF 21; McClure Br. 1, ECF 26-1. Addoh-Kondi Plaintiffs contend (at 24-25) that "there is more than enough time" to hold special elections with new district lines alongside the presidential primary elections in March 2024 and general elections in November 2024. Br. 24-25, ECF 21. They propose, in the alternative, that the Court do away with primary elections. *Id*. McClure Plaintiffs similarly ask for "special elections to be held concurrently with upcoming federal elections in November 2024." Br. 26, ECF 26-1. It is not clear whether the McClure Plaintiffs' special elections remedy would include a primary election. *Compare id.* (specifying "November 2024"), *with id.* at 27 (discussing primary timing and suggesting filing deadlines could be shifted by a few weeks).

**IV.** The County's preparations for the 2024 elections are underway. Ex. 2, Naftel Dec. ¶11, ECF 32. There are numerous races on the 2024 ballot, including presidential, congressional, statewide, judicial, and many other local races. *Id*. ¶5. The County's Chief Election Official, Probate Judge James Naftel, estimates there

will be more than 100 different ballot styles (or variations) for the 2024 elections. *Id.* ¶¶8-9. Because the County has voters who live in different congressional districts, state school board districts, county school board districts, as well as different judicial and local offices, voters will require different ballot styles depending on their address. For example, two voters might live in the same congressional district but different county school board districts; these voters receive two different ballot styles. *Id.* ¶8. "A critical part" of the County's "elections preparation is making sure the correct ballot styles are going to the correct precincts and that the correct ballot style gets into the right hands of the right voter." *Id.* ¶9. If there are changes to district lines for a race on the ballot, that will affect potentially all ballot styles and hinder the County's ability to ensure that the right ballots get into the hands of the right voters. *Id.* ¶¶9-10. Preparation of ballots and election-day equipment would have to start again. *Id.*; Ex. 3, Harris Dec. ¶¶11, 15-16, ECF 33 ("County's software uses the finalized ballot information" from December "to code the election-day voting machines").

Deadlines for the upcoming 2024 elections are attached to Judge Naftel's declaration. *See* Ex. 2, Naftel Dec. Ex. A, ECF 32-1. Candidates must qualify by November 10, 2023. *Id.* ¶12. Any qualification challenges are adjudicated between November and December. *Id.* Parties then certify candidates for primary elections on December 14, 2023. *Id.* After candidates are certified, the County generates all ballot

styles for all elections pursuant to existing district lines; reviews those ballot styles; and approves them for printing by the end of December 2023. *Id.* ¶¶12-13; Ex. 1, Stephenson Dec. ¶¶41-44, ECF 31; Ex. 3, Harris Dec. ¶¶9-10, ECF 33. The County's software uses the finalized ballot information to code election-day voting machines. Ex. 3, Harris Dec. ¶11, ECF 33. All ballots must be printed and delivered by January 10, 2024. Ex. 2, Naftel Dec. ¶15, ECF 32.

County Commission elections are not on the 2024 ballot. *Id.* ¶6. Commissioners were elected in 2022, and the next regular election will be in 2026, along with statewide races for the governorship and state legislature. Staggering elections in this way reduces the number of offices on the ballot and, in turn, reduces the burden to voters in getting to know candidates. *Id.* ¶7. There was a special election in July 2023 for the District 5 County Commissioner because the former Commissioner vacated his seat and state law prescribes a procedure for expedited special elections to fill the vacant seat. *Id.* ¶¶21-24.

If the Court were to order "special" elections for County Commission to occur alongside the 2024 elections, then County Commissioners' current terms would be shortened to two years, even though all Commissioners were just elected to four-year terms. The limited time remaining would also preclude the County Commission from having a reasonable opportunity to redraw district lines and then make them available for public inspection for at least two consecutive weeks. Ala. Code §11-3-

1.1(c). Nor would there be sufficient time for voters and potential candidates to adjust to new lines and decide whether to campaign and qualify by November 10, 2023, when qualifying ends for all candidates, after which point qualifying challenges are resolved, candidates are certified, and more than 100 ballot styles are generated and finalized by the end of December 2023. Ex. 1, Stephenson Dec. ¶¶48-51, ECF 31; Ex. 2, Naftel Dec. ¶¶11-15, 29, ECF 32; Ex. 3, Harris Dec. ¶¶9-13, 20, ECF 33. An election on a different timeline with new lines cannot later be added to the ballot without restarting the County's process of generating and auditing more than 100 ballot styles and programming election-day equipment. Ex. 1, Stephenson Dec. ¶40, ECF 31; Ex. 2, Naftel Dec. ¶10, ECF 32. The County does not have sufficient election-day equipment to add an unforeseen County Commission election to the 2024 elections by separate ballot. Ex. 3, Harris Dec. ¶¶17-19, ECF 33. Even if there were sufficient equipment, the County avoids separate ballots, which cause voter confusion and drop-off. *Id.* ¶18; Ex. 2, Naftel Dec. ¶17, ECF 32.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary and drastic remedy and "never awarded as of right." *See Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008); *Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) ("powerful exercise of judicial authority in advance of trial"). Its "chief function" is "preserv[ing] the status quo until the merits

of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney General*, 957 F.3d 1171, 1178-79 (11th Cir. 2020) (internal quotations and citation omitted).

Such an extraordinary remedy "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-45 (2018) (assuming plaintiffs were likely to succeed but denying preliminary injunction given balance of the equities). Where plaintiffs seek to enjoin the enforcement of legislation, a preliminary injunction "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Ne. Fla.*, 896 F.2d at 1285. Preliminarily enjoining local laws would "interfere with the democratic process and lack[s] the safeguards against abuse or error that come with a full trial on the merits." *Id.*

Plaintiffs bear the burden of showing (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury absent a preliminary injunction; (3) their injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) "if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Ne. Fla.*, 896 F.2d at 1285. Failure to establish irreparable harm requires denial of preliminary injunctive relief. *See id.* at 1285-86.

10

## ARGUMENT

### I.    The Balance of Harms Weighs Decidedly Against Plaintiffs

Plaintiffs' motions can be denied for their unexplained delay. Plaintiffs' delay leaves no time for their requested relief without substantial confusion and prejudice to elections officials, candidates, and voters.

#### A. Plaintiffs Cannot Establish Irreparable Harm Given Their Delay.

**1.** Plaintiffs contend that they will suffer irreparable harm without court-ordered elections as a preliminary injunction remedy. Addoh-Kondi Plaintiffs argue (at 5) that "[t]hey will suffer irreparable harm if County Commissioners are allowed to serve in unconstitutional districts until 2026." The McClure Plaintiffs argue (at 26) that "unlawful maps remaining in effect until the 2026 election" is "irreparable harm." These arguments cannot be squared with their failure to seek relief before the 2022 elections.

Delay "of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting cases); *see, e.g.*, *Alabama v. United States Dep't of Commerce*, 546 F. Supp. 3d 1057, 1073 (M.D. Ala. 2021) ("[B]y sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief."). A plaintiff "requesting a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek*, 138 S. Ct. at 1944 (citation omitted).

11

Applied here, Plaintiffs cannot establish "reasonable diligence." *Id.* Plaintiffs let the 2022 elections pass and waited another eight months before filing preliminary injunction motions seeking to unwind those 2022 elections. At that point, twenty months had passed since the Commission's adoption of the Enacted Plan. That twenty-month delay distinguishes Plaintiffs' cases from *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229 (M.D. Fla. 2022) (cited in Addoh-Kondi Br. 22, ECF 21). In *Jacksonville*, plaintiffs filed a complaint and moved for a preliminary injunction *before* the next regular elections, about four months after the adoption of new district lines. *Id.* at 1238.[5] Similarly in *Wright v. Sumpter County Board of Elections*, 361 F. Supp. 3d 1296 (M.D. Ga. 2018), and *Navajo Nation v. San Juan County*, No. 2:12-cv-00039, 2017 WL 6547635, at *19 (D. Utah Dec. 21, 2017) (cited in McClure Br. 24, ECF 26-1), special elections followed after years of litigation. Also distinguishable is *Reynolds v. Sims*, 377 U.S. 533 (1964) (cited in McClure Br. 22-23, ECF 26-1). In *Reynolds*, the Supreme Court said "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that *no further elections*"—that is, the next regularly scheduled elections—"are conducted under the invalid plan." *Id.* at 585 (emphasis

---

[5] Even that shorter delay "weigh[ed] against an injunction" but was not dispositive because "Plaintiffs were moving expeditiously" to compile a "voluminous record" within months of redistricting. *Jacksonville*, 635 F. Supp. 3d at 1300.

added). Even then, *Reynolds* acknowledged that "equitable considerations might justify a court in withholding the granting of immediately effective relief." *Id.*

Neither *Reynolds* nor any other case Plaintiffs cite contemplates what Plaintiffs seek here: after failing to seek relief *before* a regularly scheduled election, plaintiffs move *after* that election for irregular court-ordered elections as a preliminary injunction remedy. In these circumstances, the alleged irreparable harm is the result of Plaintiffs' own timing. *See, e.g.*, *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1324 (N.D. Ga. 2020) ("[Plaintiff] could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election."); *see* 11A Charles Alan Wright, et al., Federal Practice and Procedure §2948.1 (2021) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."); *Willard v. Baldwin Cnty. Bd. of Edu.*, No. 09-406, 2009 WL 10704886, at *2 (S.D. Ala. 2009); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). Nor can Plaintiffs justify their delay when their motions rely exclusively on evidence about the Enacted Plan from 2021, available to Plaintiffs well before the 2022 elections. *See Wreal*, 840 F.3d at 1248-49; *Wood*, 501 F. Supp. 3d at 1324. That distinguishes Plaintiffs' cases from others involving special elections to remediate election-day conduct. *See, e.g.*, *Hadnott v. Amos*, 394 U.S. 358, 367 (1969) (candidates excluded from the ballot, in violation of earlier injunction); *Coal. for Edu. in District One v. Bd. of Elections of*

13

*City of N.Y.*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974) (unconstitutional irregularities at polling places); *Bell v. Southwell*, 376 F.2d 659, 665 (5th Cir. 1967) (voter intimidation); *Griffin v. Burns*, 570 F.2d 1065, 1079-80 (1st Cir. 1978) (ballots invalidated). Where, as here, Plaintiffs' motions are based on facts and events occurring twenty months earlier, Plaintiffs cannot establish irreparable harm. *See, e.g.*, *Bethune-Cookman Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc.*, No. 6:22-cv-477-WWB-DAB, 2022 WL 18107602 (M.D. Fla. Nov. 22, 2022), *aff'd*, 2023 WL 3704912, at *1-2 (11th Cir. May 30, 2023).

The extraordinary remedy of a preliminary injunction is unavailable given such delay. *See Benisek*, 138 S. Ct. at 1944. Plaintiffs' twenty-month delay after redistricting is as long or longer than delays that have precluded preliminary injunctions. *See Wreal*, 840 F.3d at 1248 (five months); *Bethune-Cookman Univ.*, 2023 WL 3704912, at *1 (six months); *Snider Tire, Inc. v. Chapman*, No. 2:20-cv-1775-AMM, 2021 WL 2497942, at *5 (N.D. Ala. Apr. 27, 2021) (four months); *see also, e.g.*, *MLP v. Bibb Cnty. Bd. of Educ.*, No. 7:21-CV-1258-LSC, 2021 WL 9668206, at *2 (N.D. Ala. Sept. 17, 2021) ("If this were an emergency and if irreparable harm was occurring, Plaintiffs would not have waited thirty-nine days to take action."); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." (internal quotation

and citation omitted)); *see also Pippin v. Playboy Entm't Grp., Inc.*, No. 8:02-cv-2329-T-30, 2003 WL 21981990, at *2 (M.D. Fla. July 1, 2003) ("Delay, or too much of it, indicates that a suit or request for injunctive relief is more about gaining an advantage … than protecting a party from irreparable harm."). Plaintiffs' motions can each be denied on that ground alone. *See Benisek*, 138 S. Ct. at 1944.

### B. The Harm and Confusion Resulting from Irregular Elections Out-weighs Plaintiffs' Alleged Harm.

Plaintiffs' delay also leaves no time to conduct the irregular elections that Plaintiffs seek. Without reaching the merits, the Court can deny Plaintiffs' requested relief based on "due regard for the public interest in orderly elections." *Benisek*, 138 S. Ct. at 1944-45 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). The County has an "indisputably … compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (quotation marks omitted). Orders affecting elections "can themselves result in voter confusion." *Id.* at 4-5. And the Supreme Court has "repeatedly" instructed "lower federal courts" not to "alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). The Court has stayed preliminary injunctions of state election laws while expressing "no opinion" on the merits, *Purcell*, 549 U.S. at 5, even where the challenged law was "invalid," *Reynolds*, 377 U.S. at 585; *see also Merrill v. Milligan*, 142 S. Ct. 879, 882 (2022) (Kavanaugh, J., concurring).

Applied here, the County's interest in preserving the integrity of its elections warrants denial of Plaintiffs' motions, given Plaintiffs' timing. Even setting aside the merits of Plaintiffs' requested remedy or underlying claims, there would be insufficient time remaining for the Commission to propose redrawn lines, for the County to make them available for public inspection, for the Commission to approve them, for candidates to decide to campaign and qualify by November 10, 2023, for ballots to be created and finalized before the year ends, and for the County to ultimately administer that unforeseen election, alongside the presidential, congressional, statewide, judicial, and numerous local races. Ex 1, Stephenson Dec. ¶¶49-51, ECF 31; Ex. 2, Naftel Dec. ¶¶18, 24, 29, ECF 32; Ex. 3, Harris Dec. ¶20, ECF 33.

Addoh-Kondi Plaintiffs' prediction (at 24) that the County could run a reliable election with entirely new district lines within "38 days" based on the timetable for the recent July 2023 special election is wrong. That special election involved one vacated seat in one district with one ballot style. Ex. 2, Naftel Dec. ¶¶23-24, ECF 32; Ex. 3, Harris Dec. ¶6, ECF 33. That special election cannot be likened to County-wide elections for all five commissioners pursuant to new district lines, to coincide with numerous national, statewide, and local elections that will already require more than 100 ballot styles. Ex. 2, Naftel Dec. ¶¶9, 23-25, 28, ECF 32 (explaining recent special election left "very little time" for candidates to qualify, resulting in fewer

candidates that usual); Ex. 1, Stephenson Dec. ¶¶37-38, ECF 31 (explaining special elections are on a "faster-than-usual" timeline and require "tremendous effort" and that "[i]t take significantly more time to prepare for a County-wide election" with many races on the ballot); Harris Dec. ¶¶15-16, ECF 33. As a court in this District recently explained, special elections for vacated seats are "fundamentally unlike the one that Plaintiffs have suggested." Ex. 5, Scheduling Order at 3, *Chandler v. Allen*, 2:21-cv-1531, ECF 84 (N.D. Ala. July 11, 2023), ECF 35.

Contrary to McClure Plaintiffs' suggestion that "[f]iling deadlines for Commission candidates can be shifted a few weeks" (at 27), an unforeseen election cannot be added to the 2024 elections and then follow different deadlines than those set for the regularly scheduled 2024 elections. Ex. 1, Stephenson Dec. ¶¶40-42, 50, ECF 31 (explaining timing of ballot creation and review for more than 100 different ballot styles); Ex. 2, Naftel Dec. ¶¶12-13, ECF 32 (explaining time necessary for challenges to candidate qualifying); Ex. 3, Harris Dec. ¶¶11, 19, ECF 33 (explaining programming of election equipment). The County's election preparations are all keyed to that timeline already in place for the regularly scheduled 2024 elections. *Id.* And there is insufficient election-day equipment and too high a likelihood of voter confusion to add a last-minute race using a separate ballot. *Id.* ¶¶17-19; Ex. 2, Naftel Dec. ¶17, ECF 32.

17

Plaintiffs' suggestion that County Commission candidates could skip primary elections (Addoh-Kondi Br. 25, ECF 21; McClure Br. 26-27, ECF 26-1) also flouts "due regard for the public interest in orderly elections." *Benisek*, 138 S. Ct. at 1944-45. Forgoing primary elections would be unprecedented and confusing, allowing anyone who qualifies to appear on the November 2024 general election ballot. Ex. 2, Naftel Dec. ¶¶25-26, 28, ECF 32. That could exceed more than 10 candidates per Commission district and would preclude voters from casting straight-ticket votes in November. *Id.* ¶¶25-26. And with so many potential candidates, if no one candidate obtains a majority of votes, the Election Commission would have to decide how to determine the winner; if a runoff were required, that would be a significant additional cost to the County. *Id.* ¶27. Such an extraordinary departure from the County's regular elections processes is unwarranted in light of Plaintiffs' delay.

Plaintiffs have not "demonstrate[d] an imminent injury that would warrant the 'extraordinary and drastic' remedy of a preliminary injunction," *Wreal*, 840 F.3d at 1249, and their delayed motion threatens "the public interest in orderly elections," *Benisek*, 138 S. Ct. at 1944-45. Their motions can be denied on those grounds alone.

## II.    A "Special Mid-Term Elections" Remedy Would Be Unprecedented.

### A. Special Elections Do Not Preserve the Status Quo.

The purpose of a preliminary injunction is to preserve the status quo. *Robinson*, 957 F.3d at 1178-79; *Ne. Fla.*, 896 F.2d at 1284; *Dees v. Peters*, No. 2:21-cv-

392, 2022 WL 894609, at *3 (N.D. Ala. Feb. 22, 2022). But here, Plaintiffs ask for a dismantling of the status quo. Plaintiffs ask the Court to shorten current elected officials' four-year terms prescribed by Alabama law; to move Jefferson County voters to new districts; to invite new candidates to campaign and qualify in those new districts; and to require the County to then add those unforeseen and off-schedule elections for all five new districts to its 2024 elections preparations already underway—all as part of *preliminary* injunctive relief. Such relief goes well "beyond maintaining the status quo" and is "generally disfavor[ed]." *Greater Birmingham Ministries v. Sec'y of State*, 161 F. Supp. 3d 1104, 1113 (N.D. Ala. 2016) (denying preliminary injunction asking to change voting requirements).

### B. Special Elections Are Not Appropriate Preliminary Relief.

Special elections would be extraordinary relief even at the *end* of any case, let alone at the preliminary-injunction stage. The U.S. Supreme Court "has never addressed whether or when a special election may be a proper remedy for a racial gerrymander." *Covington*, 581 U.S. at 488. They are "'an extraordinary remedy which the courts should grant only under the most extraordinary of circumstances.'" *Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 817 (7th Cir. 2016); *see also, e.g.*, *Covington*, 81 U.S. at 488-89; *Cook v. Luckett*, 735 F.2d 912, 921-22 (5th Cir. 1984) ("[O]ur decisions reveal a strong reluctance to undertake the 'drastic, if not staggering' remedy of voiding a location election"); *Lyles v. Hale Cnty. Comm'n*, No. 04-711-CG-

M 2005 WL 8158888, at *6 (S.D. Ala. Oct. 17, 2005) (describing setting aside an election as "extraordinary relief"); *United States v. City of Houston*, 800 F. Supp. 504, 506 (S.D. Tex. 1992) ("Ordering new elections is a drastic remedy for reasons that should be obvious."). It's all the more extraordinary here, where Defendants have not even had a full opportunity to defend against Plaintiffs' claims. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395-96 (1981) (describing preliminary injunction "procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Ne. Fla.*, 896 F.2d at 1285 (preliminary injunctions "lack the safeguards against abuse or error that come with a full trial on the merits"). Defendants are aware of no case ordering special elections in analogous circumstances.

**1.** Plaintiffs attempt to do here with Commission districts what another court in this District already said some of the same Plaintiffs couldn't do in their challenge against Alabama's legislative districts. *See* Ex. 5, Scheduling Order, *Chandler v. Allen*, 2:21-cv-1531 (N.D. Ala.), ECF 35. In *Chandler*, both Greater Birmingham Ministries and the Alabama State Conference of the NAACP asked the court to expedite proceedings for "special elections" in 2024, even though legislators are not up for election until 2026. *Id.* at 3. In a reasoned order, the three-judge panel explained how "extraordinary" a redistricting plaintiff's request for special elections would be. *Id.* at 2. There, as here, plaintiffs did not seek a preliminary injunction *before* the 2022 elections. *Id.* The district court faulted plaintiffs for "downplay[ing]

the extraordinary nature of special elections by pointing to special elections that occasionally have been held to fill empty seats in the Legislature," which the district court said were "fundamentally unlike the one that Plaintiffs have suggested they might ask the court to order because those elections [for vacated seats] did not involve redistricting." *Id.* at 3. Expediting a judgment on the merits "overlook[ed] both the extraordinary nature of a court-ordered special election and the administrative challenges attendant to a special election in which district lines change." *Id.*

So too here—only five weeks have passed since Plaintiffs announced they would seek preliminary injunctions and ask for a special election. Defendants necessarily require adequate time to defend against Plaintiffs' claims on the merits, retain experts, conduct discovery, and have an opportunity for dispositive motions or trial before such an extraordinary remedy could be contemplated. It would be unprecedented to issue Plaintiffs' requested remedy in this preliminary stage. *Cf. Univ. of Tex.*, 451 U.S. at 395-96; *see also, e.g.*, *Covington*, 581 U.S. at 488-89 (reversing special elections as permanent injunction remedy).

**2.** A special elections remedy is extraordinary even after years of litigation and a final judgment on liability. In *Covington*, the U.S. Supreme Court *reversed* a district court's decision to order special elections for failure to weigh "obvious considerations," even after affirming that districts were racially gerrymandered. 581 U.S. at 487-89 & n.*. On remand, the district court *refused* to allow special elections

after weighing the equities, and despite the "widespread, serious, and longstanding nature of the constitutional violation—among the largest racial gerrymanders ever encountered by a federal court." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 884 (M.D.N.C. 2017). The court concluded a "special election would significantly interfere with the ordinary processes of state government" and "risk[ed] generating substantial voter confusion and resulting low voter turnout." *Id.* at 899.

Plaintiffs' cited cases are inapposite, given the preliminary-injunction posture and their twenty-month delay. Addoh-Kondi Plaintiffs rely (at 26) on cases cited by the *Covington* district court as well as *Burton v. Hobbie*, 561 F. Supp. 1029 (M.D. Ala. 1983). McClure Plaintiffs also rely (at 24) on *Covington* and other cases involving special elections after years of litigation. In *Covington*, the court considered special elections after extensive litigation culminating in "a five-day trial, during which the Court received testimony from two dozen witnesses and reviewed more than 400 exhibits." 270 F. Supp. 3d at 884; *accord Ketchum v. City Council of City of Chicago*, 630 F. Supp. 551, 553-56 (N.D. Ill. 1985) (describing extensive litigation and Seventh Circuit affirmance); *Wright*, 361 F. Supp. 3d at 1305 (four-year litigation history); *Navajo Nation*, 2017 WL 6547635, at *2 (six-year litigation history). And plaintiffs in the cited cases sought relief *before* elections occurred, not after. In *Ketchum*, for example, the court considered whether "plaintiffs exercised due diligence in seeking relief in *advance* of the challenged election." 630 F. Supp. at 565

(emphasis added); *see also, e.g.*, *Burton*, 561 F. Supp. at 1032 (filing after redistricting and before regularly scheduled 1982 elections); *Hadnott*, 394 U.S. at 367 (challenge brought before regular election); *Tucker v. Burford*, 603 F. Supp. 276, 279-80 (N.D. Miss. 1985) (same).

*Burton* (cited in Addoh-Kondi Br. 26, ECF 21) also presented markedly different circumstances. There, the court ordered special elections against the backdrop of the State's failure to enact a valid redistricting "plan for over eighty years." 561 F. Supp. at 1036. In *Burton*, election deadlines were only weeks away and the State had not obtained preclearance for its redistricting plan. *Id.* at 1034. The court permitted those regularly scheduled elections to proceed on the State's plan with "[c]lear and unequivocal notice" to candidates and to the public *in advance* of those elections that they would be for a shortened "one-year term." *Id.* at 1034-35. In *Burton* and other cases like it, *before* regular elections occurred, voters and candidates were on notice that their terms were shortened. *See id.* at 1033; *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981) (ordering a term of one year). Other decisions have similarly allowed special elections because cases filed before regularly scheduled elections could not be resolved in time. *See, e.g.*, *Tucker*, 603 F. Supp. at 279-80 (deciding that special election was warranted because the plaintiffs sought pre-election relief and the case could not be resolved prior to the election); *Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476, 483 n.3 (2d Cir. 1999) (explaining

district court allowed regularly scheduled elections to proceed because a special election could occur after the resolution of litigation if necessary); *Adamson v. Clayton Cnty. Elections Reg. Bd.*, 876 F. Supp. 2d 1347, 1351 (N.D. Ga. 2012) (imposing a court-ordered map to keep the regular election schedule where no new map could be adopted in time); *Smith v. Beasley*, 946 F. Supp. 1174, 1212-13 (D.S.C. 1996) (permitting an election to proceed because there was simply no time in which to change the districts, and thus a special election was necessary once litigation concluded); *see also Williams v. City of Dallas*, 734 F. Supp. 1317, 1318, 1415 (N.D. Tex. 1990) (same); *Cosner*, 522 F. Supp. at 364. These cases are the opposite of what Plaintiffs seek here—accelerating the resolution of a case filed *after* elections and shortening elected officials' terms. *Compare, e.g.*, *Burton*, 561 F. Supp. at 1034-35; *Wright*, 361 F. Supp. 3d at 1305 (explaining the court "would *not* be imposing an early election" or "'truncat[ing]'" elected officials' terms "under a rushed schedule" (emphasis added)).

Other cases cited in *Covington* are distinguishable in other ways. In *United States v. Osceola County*, the parties *agreed* to hold special elections. 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006). In *Clark v. Roemer*, special elections were necessary to fill vacant positions. 777 F. Supp. 471, 484-85 (M.D. La. 1991). Likewise in *Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, special elections followed the death of an elected official. 118 F. Supp. 3d 1338,

1341-42 (N.D. Ga. 2015) (noting "nature of this case and its procedural history make it somewhat unique"). In two other cases, the staggered nature of elections made special elections necessary so that multiple elected officials did not represent the same area. *See Large v. Fremont Cnty.*, No. 05-cv-270, 2010 WL 11508507, at *15 (D. Wyo. Aug. 10, 2010); *Navajo Nation*, 2017 WL 6547635, at *18 ("boundaries of the present districts and recommended districts overlap"). And still more cases involved unforeseeable election-day circumstances, unlike Plaintiffs' motions premised on facts from twenty months ago. In *Hadnott*, the Supreme Court ordered a special election after Black candidates were excluded from the ballot. 394 U.S. at 361-62, 367. Similarly, in *Arbor Hill Concerned Citizens v. County of Albany*, special elections were held after the county skipped an election. 357 F.3d 260, 261 (2d Cir. 2004); *see also, e.g.*, *Coal. For Ed.*, 370 F. Supp. at 53 (involving election-day irregularities); *Bell*, 376 F.2d at 665 (voter intimidation); *Griffin*, 570 F.2d at 1079-80 (invalidating ballots).

These distinguishable cases regarding "[d]rastic, if not staggering" special elections, *Bell*, 376 F.2d at 662, only confirm such relief is foreclosed here. The "exercise of a court's equity powers … must be made on a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964); *see, e.g.*, *Covington*, 581 U.S. at 487-89. Plaintiffs thus must do more than incorporate by reference factually inapposite cases. *See Holland v. Florida*, 560 U.S. 631, 650 (2010) (courts of equity act with

"awareness" of "specific circumstances"). Plaintiffs' delay, combined with this pre-liminary-injunction posture, forecloses the relief they seek.

**3.** The lack of time remaining before the 2024 elections is also grounds for rejecting Plaintiffs' extraordinary request. *Covington*, 581 U.S. at 488; Part I.B, *supra*. Even if Plaintiffs were to prevail, the Commission would then require an ade-quate opportunity to redraw district lines, make them available for public viewing, afford enough time for candidates to decide whether to run and then qualify, all well before candidate qualifying ends on November 10, 2023. *See* PI Br. 28, Addoh-Kondi ECF 21 (agreeing that Commission would be entitled "a 'reasonable oppor-tunity'" to redraw districts); *see also Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (op. of White, J.); *Burton*, 561 F. Supp. at 1030-32 (giving Legislature two attempts to draw new lines); *Large*, 2010 WL 11508507, at *2, 15 (giving the Legislature an opportunity to remedy the electoral process after five years of litigation); Ala. Code. §11-3-1.1 (requiring two weeks for public inspection); Ala. Code § 11-3-1 (qualify-ing requirements). That leaves no time to litigate this case. Even if the parties could freeze time to give Plaintiffs, Defendants, and the Court a reasonable opportunity to prove, defend against, and decide Plaintiffs' claims, that would allow the Commis-sion only weeks or less to redraw districts, make them available for public viewing, and approve the districts. That amount of time pales in comparison to the 90 days the Commission took to redistrict in 2021. *See* Ex. 1, Stephenson Dec. ¶48, ECF 31.

It would also leave little time for candidates to decide to run in the redrawn districts and qualify. *See id.* ¶50 (changes would have to be finalized well before qualifying ends in November to allow candidates enough time to qualify); Ex. 2, Naftel Dec ¶¶24-25, ECF 32 (shorter qualifying window for District 5 special election led to fewer candidates).

Plaintiffs' contrary arguments do not account for the County's preexisting obligations for the regularly scheduled 2024 elections. Elections are staggered to reduce the number of offices on the ballot, helping ensure reliable elections. Ex. 2, Naftel Dec. ¶7, ECF 32. The great number of regularly scheduled elections in 2024 will already require more than 100 different ballot styles. *Id.* ¶8. And there is less time to prepare for those elections because primaries will take place in March 2024, as compared to the May 2022 primaries for the last regular election. Ex. 1, Stephenson Dec. ¶39, ECF 31. Those more than 100 ballot styles must be reviewed and finalized in December to be printed and delivered by January 10, 2024. Ex. 2, Naftel Dec. ¶¶13-15, ECF 32. The County is also conducting special elections between now and then for vacated legislative seats, which further complicates the County's 2024 elections preparations. *Id.* ¶20. Amidst those preparations, there would be no time to add special elections for all five commission seats pursuant to redrawn lines. Ex. 1, Stephenson Dec. ¶51, ECF 31; Ex. 2, Naftel Dec. ¶29, ECF 32; Ex. 3, Harris Dec. ¶20, ECF 33.

### III.    Plaintiffs Cannot Establish Likelihood of Success on the Merits

The Court could deny Plaintiffs' motions for the foregoing reasons without reaching the merits. Plaintiffs' motion should be denied because of delay, *see Benisek*, 138 S. Ct. at 1944, but for the following reasons Plaintiffs' claims are likely to fail on the merits too.[6]

Any Equal Protection Clause claim requires proof of some intentional race-based action: "only if there is a purposeful discrimination can there be a violation of the Equal Protection Clause." *Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (collecting cases). That "principle applies to claims of racial discrimination affecting voting just as it does to other claims of discrimination." *Id.* at 67. "The Equal Protection Clause does not prohibit misshapen districts. It prohibits unjustified racial classifications." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017). It is insufficient to merely allege "a racially disproportionate impact," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), or "aware[ness]" of race short of predominance, *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (*Shaw I*), or even that the government has acted "'in spite of'" race, short of acting "'because of'" it, *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

---

[6] Defendants anticipate having additional arguments and evidence, including expert testimony, to defend against Plaintiffs' claims on the merits. *See Univ. of Tex.*, 451 U.S. at 395-96.

To meet their burden, Plaintiffs must prove race was "the predominant factor motivating" the creation of the new map, meaning it was the Commission's "dominant and controlling rationale." *Miller v. Johnson*, 515 U.S. 900, 913, 916-17 (1995). This is an *intent*-based showing, not *effects*-based: the "constitutional violation" in such cases "stems from the 'racial purpose of state action, not its stark manifestation'" in any resulting district lines. *Bethune-Hill*, 580 U.S. at 189. Applied here, it is not enough for Plaintiffs to show that the Commission could have drawn districts differently. Plaintiffs must show that "[r]ace was the criterion that … could not be compromised" in the actual drawing, ruling out all alternative non-racial explanations for the Enacted Plan. *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*); *Easley v. Cromartie*, 532 U.S. 234, 241-43 (2001) (*Cromartie II*) ("Plaintiffs must show that a facially neutral law is unexplainable on grounds other than race." (quotation marks omitted)).

### A. Addoh-Kondi Plaintiffs Disclaim Discriminatory Purpose.

As briefed in Defendants' motion to dismiss Addoh-Kondi Plaintiffs' complaint, ECF 20 at 7-11, and Defendants' forthcoming reply, the Addoh-Kondi Plaintiffs' complaint says their claim is "*not* a claim of intentional discrimination." Compl. ¶10, ECF 1 (emphasis added). Addoh-Kondi Plaintiffs' preliminary injunction arguments (at 11) similarly rest on a *failure* to act: "The Commission made no attempt to change the racial design of the 2011 Plan." To the extent Addoh-Kondi

Plaintiffs' theory of liability rests on a failure to act—without an allegation of racially predominant intent—then Addoh-Kondi Plaintiffs have failed to state an Equal Protection Clause claim, which requires race-based action, not inaction. *See Bethune-Hill*, 580 U.S. at 189. Defendants incorporate by reference their arguments made as part of the motion-to-dismiss briefing. In short, an Equal Protection Claim cannot be based on effects alone. *Id.*; *Parks v. City of Warner Robins*, 43 F.3d 609, 616 (11th Cir. 1995) ("[P]roof of discriminatory intent or purpose is a necessary prerequisite to *any* Equal Protection Clause claim." (emphasis added)).

Addoh-Kondi Plaintiffs have responded that *North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (per curiam), relieves them of showing "discriminatory intent." Addoh-Kondi MTD Response 6, ECF 32.[7] But *Covington* was specifically addressing whether a *remedial* plan properly redressed a racial gerrymander already found at the liability stage. 138 S. Ct. at 2552-53. The Court concluded, unsurprisingly, that the State could not simply copy lines found unconstitutional at the liability stage. *Id.* at 2553; *accord Jacksonville Branch of NAACP v. City of Jacksonville*, 2023 WL 119425, at *3 (11th Cir. Jan. 6, 2023) (applying *Covington* to proposed remedy). As for *Abbott v. Perez*, 138 S. Ct. 2305 (2018), which Addoh-Kondi

---

[7] Addoh-Kondi Plaintiffs have also relied on an unpublished decision denying a stay of a preliminary injunction. Addoh-Kondi MTD Response 5-6 (citing *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-14260, 2023 WL 119425 (11th Cir. Jan. 6, 2023)). In that opinion, a divided panel stated it was "not making any pronouncements on the merits of the City's appeal" and that its "analysis is necessarily brief." *Id.* at *3; *see also id.* ("order issued by a motions panel is not binding on a subsequent merits panel").

Plaintiffs also cite, every claim at issue in *Abbott* involved an intent showing. With respect to new house district lines rejected as a racial gerrymander, "Texas *d[id] not dispute* that race was the predominant factor in the design"—that is, that Texas acted with race-based purpose. *Id.* at 2334 (emphasis added). There, here, and in every other Equal Protection Clause case, Plaintiffs "bear[] the burden of proving the *race-based motive*" predominated in redistricting. *Shaw II*, 517 U.S. at 905 (emphasis added); *accord Bethune-Hill*, 580 U.S. at 189.

### B. Addoh-Kondi Plaintiffs' Illustrative Plans Are Examples of Alternative Policy Choices, Not Proof of Discriminatory Purpose

Addoh-Kondi Plaintiffs devote substantial argument to what the Commission *could have* done in redistricting and include two illustrative plans. Br. 20-21, ECF 21. Their illustrative plans would redraw District 3 to have almost exactly 50% Black population. *Id.* (explaining both illustrative plans would have 50.24% Black population or 48.51% BVAP). One illustrative plan sacrifices population equality (allowing 8.30% population deviation) to achieve fewer splits. *Id.*

With these illustrative plans, Plaintiffs have confused what the Equal Protection Clause *requires* with what it *permits*. There is no "*affirmative* obligation" in the Constitution that requires the Commission "to *avoid* creating districts that turn out to be heavily, even majority, minority." *Cromartie II*, 532 U.S. at 249 (emphasis added). Nor does the Constitution dictate policy choices about split municipalities or the shape of districts absent a claim of a predominantly race-based motive. *See*

*Shaw I*, 509 U.S. at 646; *Bethune-Hill*, 580 U.S. at 189 (Constitution does not preclude "misshapen districts"). If race did not predominate in redistricting, the Constitution has nothing to say about it. *Bethune-Hill*, 580 U.S. at 189. Applied here, the Commission could have repopulated districts in myriad ways. Its only obligation was to abide by the Constitution's *prohibition* on racial predominance.

The Constitution does not further impose an affirmative obligation to reconfigure districts to be "less white" or "less Black." If that were required, then the Constitution would perplexingly demand redistricting on the basis of race to effectuate its prohibition on redistricting on the basis of race. *But see Students for Fair Admissions, Inc. v. Pres. & Fell. of Harv. Coll.*, 143 S. Ct. 2141, 2161 (2023) ("Eliminating racial discrimination means eliminating all of it."); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."). For instance, had the Commission gone the way of Addoh-Kondi Plaintiffs' illustrative plans and intentionally removed Black voters from Districts 1 and 2 to hit a 50-percent target for District 3, voters would presumably have had a claim against the Commission for *violating* the Equal Protection Clause. *See, e.g.*, *Miller*, 515 U.S. at 915. Intentionally maximizing the number of majority-Black districts has never been permissible under the Constitution. *Id.* at 919-20; *see also Johnson v. DeGrandy*,

512 U.S. 997, 1016-17 (1994). The Commission had no obligation to intentionally remove voters on the basis of race from Districts 1 and 2.

### C. McClure Plaintiffs Cannot Equate Maintaining Existing Lines with Discriminatory Purpose

McClure Plaintiffs are also unlikely to succeed on the merits of their claims. McClure Plaintiffs contend (at 13-14) that nothing "*required* [the Commission] to maintain" the existing lines that were established by the 1985 consent decree. Exactly—and nothing *required* the Commission to abandon them either.

The Commission maintained existing lines because it was *permitted* to, not because it was *required* to. Ex. 1, Stephenson Dec. ¶17, ECF 31. The only *requirement* discussed during the redistricting process was the requirement to re-populate underpopulated districts to avoid unconstitutional malapportionment. *Id.* at Ex. B, ECF 31-2 (presentation); Oct. Meeting Tr. 27:8-28:1, 32:6-33:3, McClure PI Ex. F, ECF 27-2; Nov. Hearing Tr. 12:9-20, McClure PI Ex. D, ECF 27-1. As for maintaining district lines, Commissioners discussed their desire to maintain district lines for continuity of representation. *See, e.g.*, Nov. Hearing Tr. 35:22-36:1, ECF 27-1 ("no one really likes to change" district lines); *id.* at 45:8-10 ("we don't want to really give up people, but we have to make it balanced and even"); *id.* at 45:24-25 ("no one likes change"). And nothing in the Constitution prohibited the Commission from following existing district lines as good policy. The Supreme Court has explained that "preserving the cores of prior districts" is a "legitimate objective[]." *See*

33

*Karcher v. Daggett*, 462 U.S. 725, 740 (1983); *see also Montiel v. Davis*, 215 F. Supp. 2d 1279, 1283-84 (S.D. Ala. 2002) (three-judge court) ("race-neutral districting criteria" include "preservation of the cores of existing districts"). The Supreme Court has affirmed a state's interest in "maintaining core districts," *Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997), and "maintaining existing relationships between incumbent congressmen and their constituents," *White v. Weiser*, 412 U.S. 783, 791 (1973); *see also Reynolds*, 377 U.S. at 583 (recognizing "stability and continuity in the organization of the legislative system").

McClure Plaintiffs cite *Covington* to cast doubt on the idea that district lines can be constitutionally maintained. Br. 14, ECF 26-1. But explained above, the cited *Covington* decisions are from the *remedial* stage of that litigation. *Covington* stands for this proposition: when a plaintiff proves race predominated in redistricting at the liability stage, the Legislature is precluded from using those same race-predominant lines as a proposed remedy at the remedial stage. 138 S. Ct. at 2551. That proposition is inapplicable here, where Plaintiffs have yet to prove that race predominated. Similarly, *Allen v. Milligan*, 143 S. Ct. 1487 (2023), has no bearing here. *Allen* held that "adherence to a previously used districting plan" cannot defeat an effects-based "*§ 2 claim*." 143 S. Ct. at 1505 (emphasis added). But here Plaintiffs have alleged an *intent*-based racial gerrymandering claim under the Equal Protection Clause, not an effects-based §2 claim. Neither *Covington* nor *Allen* support Plaintiffs' novel theory

here. The Commission's districts have been in place since 1985, drawn in response to Voting Rights Act litigation and precleared for decades. It would be baseless to suggest that the Enacted Plan merely perpetuates "an old racially discriminatory plan." *Allen*, 143 S. Ct. at 1505.

Nor can McClure Plaintiffs sidestep their burden of proving racially predominate purpose by imputing race-based considerations that motivated the 1985 consent decree to the current Commission. *See* McClure Br. 13-14, ECF 26-1. Even assuming *arguendo* that there was something constitutionally suspect in a court-approved consent decree, imputing any such flaw to the current Commission flouts the presumption of good faith because what matters is whether race dominated for *this* Commission. *See Abbott*, 138 S. Ct. at 2324-25 ("the burden of proof and the presumption of good faith are not changed by a finding of past discrimination"). The Eleventh Circuit has "rejected the argument that 'a racist past is evidence of current intent.'" *League of Women Voters v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023) (*League II*); *see also* Defs. MTD 28-29, ECF 19. Instead of relying on "'old, outdated intentions of previous generations,'" courts must "'look at the precise circumstances surrounding the passing of the' law in question." *League II*, 66 F.4th at 923; *accord League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1372-73 (11th Cir. 2022) (*League I*). For example, in *Abbott*, race predominated in the drawing of a new house district. 138 S. Ct. at 2334. So too here, McClure Plaintiffs would

have to show that race predominated the *current* Commission's considerations, either by direct or circumstantial evidence.

Put another way, McClure Plaintiffs must prove that the present Commission maintained existing lines in the Enacted Plan for *race-based* reasons. As Plaintiffs' own authorities illustrate, there is a critical difference between maintaining existing lines as good or convenient policy and maintaining existing lines on the basis of race. The former is permitted and the latter is prohibited, assuming considerations of race crossed the "line" from "racial consciousness" to "racial predominance," *Allen*, 143 S. Ct. at 1511-12 (plurality). In the *Jacksonville* litigation discussed by both Plaintiffs, the district court "emphasize[d] that the City is *not* required to show that the City Council 'purged' any improper racial 'taint' from" an earlier redistricting cycle. *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1288 (M.D. Fla. 2022) (emphasis added). What led the district court to conclude that plaintiffs were likely to succeed on the merits was more specific: direct evidence from the current redistricting process showing that the city council maintained district lines for race-based reasons. *See, e.g.*, *id.* at 1293 ("'So our goal would be to get everybody, you know, down to 60 percent or below[.]'"); *id.* at 1257 ("I think the 68 percent of minority concentration in a district is—is challenging and problematic."); *id.* at 1259 ("'I want to make sure that he's comfortable and I'm comfortable in terms of the ethnoracial black and white.'"). There were numerous members of the public

who "spoke about perceived racial packing" and "perceived partisan gerrymander-ing." *Id.* at 1290. But absent such evidence, nothing in the Constitution required the Commission to abandon existing district lines. *Id.* at 1288. Discussed below, there is no *Jacksonville*-like evidence here, no extensive discussion about hitting racial targets, and no public testimony about racial gerrymanders. *See, e.g,* Ex. 1, Stephen-son Dec. ¶17. Thus, while the Commission would have been *permitted* to depart from existing lines, the Constitution did not *require* it to do so—let alone exchange its race-neutral approach with a race-based one.

### D. McClure Plaintiffs' Allegations Regarding the 2021 Redistricting Do Not Establish Racial Predominance

**1.** There is no direct evidence that racial considerations predominated over the Commission's intention to maintain existing lines during the 2021 redistricting pro-cess. Barry Stephenson, the Chairman of the Jefferson County Board of Registrars, was responsible "to help facilitate the redistricting process using the Board of Reg-istrar's GIS software for the Jefferson County Commissioners." Ex. 1, Stephenson Dec. ¶5, ECF 31. To that end, "Commissioners and some of chiefs of staff came to [the Board of Registrars] office to propose changes that could be made to the redis-tricting plan to equalize population." *Id*. ¶12. The "Commission's goal was to redis-trict each Commission district to be within +/-1% of ideal population while generally following existing lines," not a race-based one. *Id.* ¶¶20, 23. And in the Enacted Plan, nearly all voters stayed in their existing districts. *Id.* ¶22.

Unlike *Jacksonville*, nobody testified at the Commission's public meeting or hearing that the existing lines were racial gerrymandered or that they needed to be kept in place on the basis of race. *Id.* ¶17. Stephenson's presentation to the Commission focused on maintaining equal population in the existing districts. *See* Nov. Hearing Tr. at 11:20-17:19, McClure PI Ex. D, ECF 27-1. Residents asked "that all the districts have the same number of citizen[s]" (*id.* at 20:12-14, 20:25-25:4), particularly Districts 1 and 2 (*id.* at 23:17-24); that they be kept in their current district as under the Enacted Plan (*id.* at 22:4-6, 29:2-6); and that their economic concerns be heard (*id.* at 26:7-27:8). For their part, the Commissioners, including Commissioner Scales as the only no vote, were also concerned about equal population and acknowledged no one wanted to change the existing lines. *See id.* at 34:15-19; 35:22-36:1 ("no one really likes to change" district lines); *id.* at 38:6-8 ("I want to thank the Board of Registrars because I'm not picking up new areas or territory other than going over there to Dolomite."); *id.* at 45:8-10 ("we don't want to really give up people, but we have to make it balanced and even"); *id.* at 45:24-25 ("no one likes change").

Against the weight of that evidence, McClure Plaintiffs emphasize (at 7-9) a single statement of Commissioner Scales and then a single statement of Commissioner Tyson after the Commission voted. Commissioner Scales's quoted statement was about politics. *Id.* 31:21-22. She said Center Point and Dolomite were "highly

Democratic" but questioned whether the areas given to Commissioner Tyson ("Homewood, Ross Bridge, [and] Lake Shore") were too. *Id.* at 33:1-5. In context that Plaintiffs' brief omits, the suggestion was that adjustments to District 2 had made it more Republican. After the Commission voted, Commissioner Tyson respond: "If you think I will draw myself into my demise you got to be crazy." *Id.* at 39:21-22. Viewed in that context, comments about Democratic and Republican areas can only be understood as political ones.

The same is true of Commissioner Tyson's statements after the Commission voted. McClure Plaintiffs highlight (at 8-9) her statements about the percentage Democratic voters and Black voters in areas newly added to her district as evidence of racial sorting. Those statements were made in the context of explaining why the minimal changes to her district would not result in her political "demise." *Id.* at 39:21-22; *see Cromartie II*, 532 U.S. at 245. And context shows she was explaining how the areas added to the district were a natural continuation of areas already in her district. Nov. Hearing Tr. 40:1-2, McClure PI Ex. D, ECF 27-1 ("I pulled in the rest of the senior citizen box that I already have."); *id.* at 40:9 ("Oxmoor is already in my district").

That Commissioner Tyson spoke about the politics or demographics of these areas after the vote is not sufficient evidence that race predominated in redistricting. Those statements in response to Commissioner Scales do not cross the line from

race-consciousness to race-predominance. *See Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1324-1325 (11th Cir. 2021); *see also League II*, 66 F.4th at 940 ("[T]he concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent."). A Commissioner, while focusing on "reliable Democratic precincts within a district" may "end up with a district containing more heavily African-American precincts." *Cromartie II*, 532 U.S. at 245. But the reasons for this "would be political rather than racial." *Id.*[8]

Plaintiffs also ignore the presumption of good faith owed to the Commission and instead read a few statements in the worst conceivable light. *But see League I*, 32 F.4th at 1373-74. "Applying the presumption of good faith—as a court must— that statement by a single legislator is not fairly read to demonstrate discriminatory intent by the" Commission. *See id*. "Caution is especially appropriate" when "legitimate political explanation[s]" are involved "and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242. Plaintiffs have not ruled out the alternative explanation that *political* considerations were the predominant concern in the exchange. *Id.* at 241-42, 245.

---

[8] As for McClure Plaintiffs' assertion (at 9) that the "Commissioners could not have been looking at party registration" because "voters do not list or register by political party when registering to vote," Plaintiffs agree that Commissioners can see prior election results. Br. 9; *see also Montiel*, 215 F. Supp. 2d at 1283 (legislators can know "that black voters and Democratic voters in Alabama are highly correlated" by knowing "recent election returns to ascertain actual voter behavior" in the relevant areas).

Even if this Court does "not presume good faith," *see League I*, 32 F.4th at 1373-74, McClure Plaintiffs cannot show likelihood of success. At most, after the vote, one Commissioner explained that she "considered race" of some new constituents "along with other … considerations; and as so read it says little or nothing about whether race played a *predominant* role comparatively speaking." *Cromartie II*, 532 U.S. at 253. And even if race "may have even been the *only* motivation" for a Commissioner, that is insufficient to show that the *Commission* was predominantly motivated by race. *Lee v. City of Los Angeles*, 908 F.3d 1175, 1183-84 (9th Cir. 2018); *compare, e.g.*, *id.* at 1185 (insufficient that a legislator "stated that his 'priority' was to 'make sure [they] have a black vote or two on that council'"), *with Walters v. Bos. City Council*, No. 22-12048, 2023 WL 3300466, at *12 (D. Mass. May 8, 2023) (plaintiffs "met their burden" of showing "that a majority of Councilors relied on race as the predominant consideration" because "discussions about racial demographics were not isolated 'snippets' made by a few City Councilors"); *see also League II*, 66 F.4th at 931-32 ("the explanatory value of an isolated statement would be limited" because what "'motivates one legislator … is not necessarily what motivates scores of others'"); *id.* at 932 ("That the statement was made by the sponsor adds little to its significance."); *see also Greater Birmingham Ministries*, 992 F.3d at 1324 & n.37.

Plaintiffs' allegations pale in comparison to cases with direct evidence of race-predominant motives. In the *Covington* litigation (*see* McClure Br. 12, 14, ECF 26-1), the district court found that race predominated because legislators expressly instructed their cartographer to draw districts "with at least 50%-plus-one BVAP ... everywhere there was a minority population large enough to do so." *Covington v. North Carolina*, 316 F.R.D. 117, 126, 130 (M.D.N.C. 2016). The legislature later "copied" the cores of those "previously invalidated" lines for their proposed remedial plan, after the U.S. Supreme Court affirmed on liability. *Covington*, 138 S. Ct. at 2551-52.

Similarly in *Clark v. Putnam Cnty.*, 293 F.3d 1261 (11th Cir. 2002) (*see* McClure Br. 12, ECF 26-1), plaintiffs proved the racially predominant intent to "'maximize the black voting strength'" in two districts. *Id.* at 1264, 1267; *see also ALBC v. Alabama*, 575 U.S. 254, 273 (2015) ("The legislators ... told their technical adviser, that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible."). But there is no similar evidence here that the Commission maintained district lines *on the basis of race*, let alone acted with the predominant intent of hitting racial targets. *See* Ex. 1, Stephenson Dec. ¶¶17, 23, ECF 31 & Ex. C, ECF 31-3 (showing changed demographics).

**2.** There is also insufficient circumstantial evidence that race predominated to warrant a preliminary injunction. The Commission's stated goal of adjusting existing

district lines only as necessary to repopulate districts within +/-1% of ideal population does not provide any inference of race predominance, without more, nor can the Court infer race predominance simply because the Enacted Plan resulted in "a higher percentage of black population into one district or the other." *ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1059 (M.D. Ala. 2017); *Greater Birmingham Ministries*, 992 F.3d at 1322 (absent a discriminatory impact that is "'unexplainable on grounds other than race, … the Court must look to other evidence'"). The racial composition of each district can necessarily change even under "neutral districting criteria." *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879 (E.D. Va. 2019) ("In our view, this effect is not evidence of race-based decisionmaking, but rather is a foreseeable and necessary result of a remedial plan that does not subordinate traditional districting factors to race.").

Plaintiffs rely on inapposite cases to support their argument that because the Commission moved some Black voters to new districts, they did so "because of" race. *Feeney*, 442 U.S. at 279. In *South Carolina State Conference of NAACP*, for example, the court concluded that the cartographer dramatically departed from the "least change" approach when moving "nearly 17,000 African Americans" from one congressional district to another. *S. C. State Conf. of the NAACP v. Alexander*, No. 3:21-cv-3302, 2023 WL 118775, at *8 (D.S.C. Jan. 6, 2023). Here, by comparison, McClure Plaintiffs' theory of liability is that the Commission abided *too closely* to

43

existing district lines. Likewise, in the *Bethune-Hill* litigation, the court relied on direct evidence as well as expert testimony that showed precise and specific division of Black and white voters during redistricting. *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 148, 156 (E.D. Va. 2018). Here, by comparison, Plaintiffs' expert identifies various "VTD Splits" that, if intended to correspond with precinct splits, are inaccurate. *See* Ex. 1, Stephenson Dec. ¶34, ECF 31 (discussing Cooper Report, ECF 26-5). The Enacted Plan splits only four precincts, each of which was split along natural or municipal boundaries for the purpose of equalizing population, *id.*, far from the purpose of segregating voters by race. McClure Plaintiffs' assertion (at 15) that "the Enacted Plan splits municipalities and VTDs (precincts) in a way only explainable by Defendants' racially predominant packing" thus appears to be based on a mistaken understanding of the facts. To be sure, various municipalities are as a result of their boundaries. Ex. 1, Stephenson Dec. ¶¶33-34, ECF 31 ("municipal boundaries tend to look like 'bug splats'" and "it would be very difficult to redistrict along municipal boundary lines"). Even McClure Plaintiffs' expert agrees that there is a "VTD/place split tradeoff" in redistricting. Cooper Report ¶37, ECF 26-5. "In many instances, municipal boundaries do not conform to

Jefferson County's VTD boundaries," meaning "preserving place boundaries often forces VTD splits," and *vice versa*. *Id*.[9]

**3.** Finally, McClure Plaintiffs' reliance on illustrative plans is not enough to establish likelihood of success for the same reason Addoh-Kondi Plaintiffs' reliance on illustrative plans falls short of that burden. *See* Part III.B, *supra.* Plaintiffs contend (at 16) that illustrative plans "reveal[] that the low BVAPs in these districts do not flow from neutral redistricting rules, but rather race-based choices." They do not.

Illustrative Plan A abandons existing district lines. Cooper Report ¶30, ECF 26-5. And to what end? It merely "splits fewer municipalities and unincorporated [sic] than the Enacted Plan." *Id.* ¶33. Splitting fewer municipalities does not show that the Commission made "race-based choices," PI Br. 16, ECF 26-1, or that Defendants intended to discriminate on the basis of race in choosing the Enacted Plan, *ALBC*, 231 F. Supp. 3d at 1059 ("That the legislature split a precinct does not necessarily prove that race predominated."). It merely shows that districts "can be

---

[9] McClure Plaintiffs' other critiques of the Enacted Plan fail too. They assert (at 9) that the Enacted Plan "exceeded the [Commission's population] target of +/-1%" because the Enacted Plan's total population deviation was 1.73%. Plaintiffs either misunderstand population deviation or misstate the Commission's goals. For the Commission to have "exceeded" its +/-1% target, the total population deviation would have exceeded 2%. Similarly, to the extent Plaintiffs mean to suggest (at 4) that Alabama law requires "electoral districts," as they say, to be "compact" and coincide with "highways, roads, streets," and so forth, that misstates Alabama law. Each "precinct" must meet those requirements, not districts themselves. Ala. Code §17-6-2(b). No provision of Alabama law precludes the Commission from retaining the existing districts' same shape over the decades, even if they're "misshapen," so long as race does predominate and the districts are equally populated. *See Bethune-Hill*, 580 U.S. at 189.

drawn" in a different manner consistent with *other* neutral redistricting principles. Cooper Report ¶27, ECF 26-5.

Illustrative Plan B provides shows how the Commission could have prioritized "the north-south topography of Jefferson County." Cooper Report ¶34, ECF 26-5. Like Illustrative Plan A, Plan B ignores the existing lines in favor of entirely new districts. Plan B does not abide by the Commission's goal of +/-1% population deviation. *Id.* ¶35. The deviation between the largest and smallest districts is nearly 5%. *Id.* Nothing required the Commission to sacrifice population equality in that way. Plan B is not circumstantial evidence of race-based redistricting; it is circumstantial evidence that the Commission could have abandoned its population equality goals and instead prioritized "north-south topography," Cooper Report ¶34.

Finally, Illustrative Plan C largely resembles Plan B but with fewer splits of municipalities and a smaller population deviation. It again illustrates that districts *could* be drawn in a number of ways that do not run afoul the Equal Protection Clause, but it is not evidence of what was *required* to be drawn. Even if "superior to or on par with the Enacted Plan in terms of key redistricting metrics," *id.* ¶¶29, 42, Plan C does not render the Enacted Plan unconstitutional. Plaintiffs must prove that race was the "criterion that … could not be compromised" in the Enacted Plan, *Bethune-Hill*, 580 U.S. at 189, not that other plans split more or less municipalities or deviate by more or less people.

Plaintiffs' illustrative plans would have also raised constitutional concerns if adopted by the Commission. They redraw districts to remove Black voters from Districts 1 and 2 to increase Black voters in District 3, and thereby maximize the number of predominantly Black districts. *See* Cooper Report ¶¶31, 35, 39, ECF 26-5. If the Commission had done so intentionally, then such a redistricting strategy is a paradigmatic example of racial predominance. *See Miller*, 515 U.S. at 926-27; *see also DeGrandy*, 512 U.S. 1016-17. Such maximization raises "serious constitutional concerns." *Miller*, 515 U.S. at 926; *see also DeGrandy*, 512 U.S. at 1016 (rejecting a hypothetical where every majority-minority district was drawn at 51%). This strategy of intentionally removing voters from existing majority-Black districts based on their race is little different than the redistricting strategy summarily rejected by the Supreme Court in *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1247 n.1, 1249 (2022).

### E. Plaintiffs Cannot Succeed on a Theory that the Commission Should Have Done *More* to Move Voters on the Basis of Race.

Both sets of Plaintiffs' fall back on the theory that the Commission did not do *enough* to change the racial makeup of districts. Addoh-Kondi Plaintiffs argue (at 11) that the "Commission made no attempt to change the racial design of the 2011 Plan." They argue (at 13) that maintaining "large majorities of Black residents at 78.27% in District 1 and 66.18% in District 2" in the Enacted Plan is unconstitutional. Likewise, McClure Plaintiffs fault Districts 1 and 2 as "supermajority Black

districts." Br. 16, ECF 26-1. They argue (at 23) that "Defendants must adopt a plan that does not pack Black voters into just two supermajority Black districts, but instead draw districts that better comply with traditional redistricting principles, decreases the BVAP in Districts 1 and 2 to narrowly tailor those districts, and revises Districts 3, 4, and 5 so that Black voters are no longer artificially denied electoral influence in additional districts." The notion that the Commission should have removed Black voters from Districts 1 and 2 on the basis of their race turns the Equal Protection Clause on its head. *See SFFA*, 143 S. Ct. at 2161, 2170 ("We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'"); *see also Missouri v. Jenkins*, 515 U.S. 70, 122 (1995) (Thomas, J., concurring) (admonishing that the Equal Protection Clause is to ensure equal treatment without regard to skin color); *Parents Involved*, 551 U.S. at 748.

Plaintiffs' contrary arguments rest on a mistaken view about the interplay between the Equal Protection Clause and the Voting Rights Act. Plaintiffs fault the Commission for failing to justify the Enacted Plan's district lines by establishing that the VRA *requires* them. Addoh-Kondi Br. 18, ECF 21; McClure PI Br. 17-18, ECF 26-1. But the question here is not what the VRA *requires*; it is what the Equal Protection Clause *permits*. And none of Plaintiffs' cited cases stand for the radical proposition that the Commission cannot maintain existing district lines without first

satisfying strict scrutiny. *See* Addoh-Kondi Br. 19 (citing *Wis. Legis.*, 142 S. Ct. 1245, and *Bush v. Vera*, 517 U.S. 952 (1996)). Both *Wisconsin Legislature* and *Vera* stand for the basic principle that race cannot predominate *even when* complying with the Voting Rights Act without satisfying strict scrutiny. *Wis. Legis.*, 142 S. Ct. at 1247-50 & n.1 (establishing new majority-minority district such that all majority-minority districts had nearly exactly 50% BVAP); *Bush*, 517 U.S. at 969-75 (involving new districting plan "unexplainable in terms other than race" and districts to achieve "maximization of minority voting strength" (quotation marks omitted)). Neither suggests that race predominates in redistricting merely because today's districts continue to *resemble* longstanding VRA districts from past plans: "Strict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones." *Bush*, 517 U.S. at 965 (plurality). For 58 years, districting schemes have transformed across the country in furtherance of the Voting Rights Act. A race-neutral redistricting plan that continues to resemble that decades-long effort cannot now be castigated as unconstitutional.

To the extent Plaintiffs' argument is that past redistricting plans were unconstitutional and the present plan perpetuates the unconstitutionality, preliminary injunctive relief premised on such a theory of longstanding unconstitutionality would be barred by laches. *See, e.g.*, *Miller v. Bd. of Comm'rs of Miller Cnty.*, 45 F. Supp. 2d 1369, 1373-74 (M.D. Ga. 1998) (laches precluded preliminary injunctive relief);

*see also White v. Daniel*, 909 F.2d 99, 102-103 (4th Cir. 1990); *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1314-18 (N.D. Ala. 2019). And as to the Enacted Plan, any such past defect would not condemn the present race-neutral redistricting plan. *See Abbott*, 138 S. Ct. at 2324 (explaining "[p]ast discrimination" is not unremovable "original sin"); *Greater Birmingham Ministries*, 992 F.3d at 1325; *Johnson v. Gov. of State of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: August 11, 2023

Respectfully submitted,

*/s/ Taylor A.R. Meehan*
Taylor A.R. Meehan*
Rachael C. Tucker*
Kathleen L. Smithgall*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
(703) 243-9423
taylor@consovoymccarthy.com
rachael@consovoymccarthy.com
katie@consovoymccarthy.com

Dorman Walker
Balch & Bingham LLP
105 Tallapoosa St., Suite 200
Montgomery, Alabama 36104
(334) 269-3138
dwalker@balch.com

*Counsel for Defendants*
*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I served the foregoing document with the Clerk of Court using the Court's ECF system, thereby serving all counsel who have appeared in this case.

*/s/ Taylor A.R. Meehan*

Taylor A.R. Meehan

*Counsel for Defendants*