FILED

2023 Dec-19  AM 08:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CARA MCCLURE, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:23-cv-00443-MHH** |
| | } | |
| **JEFFERSON COUNTY** | } | |
| **COMMISSION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

---

| | | |
|---|---|---|
| **ALEXIA ADDOH-KONDI, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:23-cv-00503-MHH** |
| | } | |
| **JEFFERSON COUNTY** | } | |
| **COMMISSION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Jefferson County Commission is the governing body of Jefferson County, Alabama.[1]  By statute, "[f]ollowing the release of any federal decennial census," the Commission "may, by resolution, alter the boundaries of the districts" from which the commissioners are elected and "shall file" with a Jefferson County probate judge

---

[1] *Government*, JEFFERSON CNTY, ALA., https://www.jccal.org/Default.asp?ID=3&pg=Government (last visited October 17, 2023).

"a certified copy" of "a map of the county showing the boundaries of the revised districts." Ala. Code § 11-3-1.1 (a), (e) (1975).

The plaintiffs in these consolidated cases challenge the revised district boundaries the Jefferson County Commission adopted in November 2021, following the 2020 United States Census.[2]  The plaintiffs contend that the 2021 redistricting plan is the product of racial gerrymandering, a practice that violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (*McClure et al v. Jefferson Cnty Comm'n, et al.*, No. 2:23-cv-00443- MHH, Doc. 1, p. 2; *Addoh-Kondi et al v. The Jefferson Cnty Comm'n, et al.*, No. 2:23-cv-00503-MHH, Doc. 1, p. 1).  The plaintiffs have asked the Court to preliminarily enjoin the Commission's use of the November 2021 redistricting plan, to direct the creation of a new plan, and to order a special election to allow voters to select commissioners pursuant to a new plan.  (23-cv-443, Doc. 26-1, p. 8; 23-cv-503, Doc. 30-1, p. 8).

---

[2] The plaintiffs in the *McClure* case are Cara McClure; Greater Birmingham Ministries, on behalf of its members; the Alabama State Conference of the National Association for the Advancement of Colored People— the NAACP, on behalf of its members; and Metro Birmingham Branch of the NAACP, on behalf of its members.  (23-cv-443, Doc. 1).  The plaintiffs in the *Addoh-Kondi* case are Alexis Addoh-Kondi, Ja'nelle Brown, Cynthia Bonner, Eric Hall, Michale Hansen, Julia Juarez, Charles Long, William Muhammad, Fred Lee Randall, Tammie Smith, and Robert Walker. (23-cv-503, Doc. 1).  The Court notes that the spelling of Ms. Addoh-Kondi's and Mr. Hansen's first names differ in Docs. 1 and 21 in case 23-cv-503.

The defendants have asked the Court to dismiss these cases.  (23-cv-443, Docs. 19, 20; 2:23-cv-503, Docs. 23, 24).[3]  This opinion resolves the parties' motions.

To evaluate the parties' motions, this opinion begins with a summary of earlier litigation that produced the five single-member districts that constitute the Jefferson County Commission today and the plaintiffs' allegations concerning the November 2021 redistricting plan.  Against this backdrop, the Court addresses the motions to dismiss and then considers the motions for preliminary injunction.[4]

## I.

These consolidated cases trace their roots to *Taylor v. Jefferson County Commission,* a Voting Rights Act case that the Taylor plaintiffs filed in 1984.  *Taylor v. Jefferson Cnty Comm'n,* No. CV 84-C-1730-S.  Between 1931 and 1984, by statute, the Jefferson County Commission had three commissioners who were elected at-large.  (23-cv-443, Doc. 1, p. 8, ¶ 11; 23-cv-503, Doc. 1, pp. 2, 9, ¶¶ 3,

---

[3] The plaintiffs named as defendants in the *McClure* and *Addoh-Kondi* cases the Jefferson County Commission and the five commissioners elected in 2022 to serve on the Commission.  (23-cv-443, Doc. 1, pp. 6-7; 23-cv-503, Doc. 1, pp. 8-9).  Voters replaced the commissioner for District 5 during a special election in 2023.  PROB. CT. OF JEFFERSON CNTY. JUNE 8, 2023 LEGAL NOTICE, https://www.jccal.org/Sites/Jefferson_County/Documents/Main/Public%20Legal%20Notice%20 Special%20Election%20D5.pdf (last visited Oct. 20, 2023).

[4] The plaintiffs have presented evidence concerning their request for a preliminary injunction.  In this opinion, the Court relies primarily on the plaintiffs' allegations in their complaints.  Per the standard set forth below, the Court presents the allegations in the light most favorable to the plaintiffs.  In the discussion that follows, the Court notes where the plaintiffs' factual allegations are undisputed.  To the extent that the Commission disputes the plaintiffs' factual allegations, at later stages of this litigation, the Court will look beyond the parties' allegations and will consider the parties' arguments in the context of the evidentiary record that the parties present.

32). Under the at-large election process, voters in Jefferson County never elected a commissioner who was Black even though by the 1980s, Black residents comprised approximately one-third of the county's total population. (23-cv-443, Doc. 1, p. 8, ¶¶ 12, 14).

The *Taylor* plaintiffs challenged the at-large electoral scheme under Section 2 of the Voting Rights Act. In August 1985, the Court entered a consent decree that eliminated the three at-large seats on the Commission and replaced them with five commissioners elected from single-member districts. (23-cv-443, Doc. 1, pp. 8–9, ¶ 14; 23-cv-443, Doc. 1-1, p. 2). The consent decree "established two majority-Black districts where Black voters would have an opportunity to elect candidates of [their] choice to the Commission." (23-cv-443, Doc. 1, p. 9, ¶ 14; *see also* 23-cv-443, Doc. 1-2, pp. 2–4; 23-cv-503, Doc. 1, p. 10, ¶ 33). Under the consent decree, District 1 "had a Black population of 65.6%, and [] District 2 had a Black population of 66.8% based on the 1980 census." (23-cv-443, Doc. 1, p. 9, ¶ 14; *see also* 23-cv-443, Doc. 1-2, p. 3; 23-cv-503, Doc. 1, pp. 2, 9, ¶¶ 4, 33). "At that time, because Black registration rates and turnout rates historically had been low, it was generally thought that 65% Black districts were needed to provide Black voters an equal opportunity to elect candidates of their choice." (23-cv-503, Doc. 1, p. 9 ¶ 33). In 1985, to accomplish "the 65% majority-Black targets" in Districts 1 and 2, "many precincts had to be divided," and six cities

4

were split:  Birmingham, Tarrant, Fairfield, Gardendale, Irondale, and Fultondale. (23-cv-503, Doc. 1, p. 10, ¶ 34).  The Alabama Legislature adopted the structure mandated by the consent decree and codified the five-member, single-district commission in 1997.  Ala. Code § 45-37-72; (23-cv-443, Doc. 1, p. 9, ¶ 15; 23-cv-503, Doc. 1, p. 9, ¶ 32).[5]

Census data shows that in the decades following the implementation of the 1985 consent decree, Jefferson County's Black population steadily increased, constituting 35.07 % of Jefferson County's total population in 1990, 39.36 % of Jefferson County's total population in 2000, and 42.5 % of Jefferson County's total population in 2010.  (23-cv-503, Doc. 1, p. 11, ¶ 36).  According to the 2020 census, Black citizens constituted 42.91 % of Jefferson County's total population.  (23-cv-443, Doc. 1, p. 9, ¶ 18).  The plaintiffs allege that, notwithstanding these changing demographics, after each census between 1990 and 2020, the Jefferson County

---

[5] Section 45-37-72(a) states:  "It is the intent of this section to implement the amended federal court order, and related orders, dated October 31, 1985, Civil Action No. 84-C-1730-S, in the United States District Court for the Northern District of Alabama, Southern Division, in the case of Taylor, et al. v. The Jefferson County Commission, and subsequently redrawn by the county commission pursuant to Section 11-3-1.1."

Section 45-37-72(b) states:  "There is created and established in and for Jefferson County a single-member district governing body. The Jefferson County Commission shall be composed of five members, elected from single-member districts one through five, inclusive, which districts are described in the amended federal court order dated October 31, 1985, and related orders, in Civil Action No. 84-C-1730-S in the United States District Court for the Northern District of Alabama, Southern Division, in the case of Taylor, et al. v. The Jefferson County Commission, and subsequently redrawn by the county commission pursuant to Section 11-3-1.1."

Ala. Code §§ 45-37-72(a), (b) (1975).

Commission maintained "the two super-majority-Black districts and three majority-White districts established in the 1985 plan."  (23-cv-503, Doc. 1, p. 11, ¶ 37; *see also* 23-cv-443, Doc. 1, p. 10, ¶¶ 19-20).

According to the 2020 Census, Jefferson County's overall population increased 2.2%, but the growth was not evenly distributed among the county's five voting districts.  (23-cv-443, Doc. 1, p. 15, ¶ 35).[6]  Based on 2020 Census data, the districts that the Jefferson County Commission adopted following the 2010 census had the following populations:

|  |  |
|---|---|
| District 1 | 122,689 |
| District 2 | 121,372 |
| District 3 | 142,776 |
| District 4 | 142,111 |
| District 5 | 145,773 |
|  |  |

(23-cv-443, Doc. 1, p. 17, ¶ 42).[7]  "Black residents [] drove much of the increase in total population" in Jefferson County, "rising from 280,083 in 2010 to 289,515 in 2020."  (23-cv-503, Doc. 1, p. 12, ¶ 40).  In 2020, within the boundary lines the Commission adopted following the 2010 census, Black residents "made up 30.06%,

---

[6] This allegation is undisputed.  (23-cv-443, Doc. 31, p. 3, ¶ 9).

[7] This allegation is undisputed.  (23-cv-443, Doc. 31, p. 4, ¶ 10).

32.46%, and 14.27% of majority-White Districts 3, 4, and 5, a dramatic increase from 22.2%, 5.0%, and 6.3% in 1985." (23-cv-503, Doc. 1, p. 12, ¶ 40).

The plaintiffs allege that in considering the implications of the population growth in Jefferson County as of 2020, the Commission took the position that federal law required the Commission "to ensure near exact population equality amongst Commission Districts." (23-cv-443, Doc. 1, p. 16, ¶ 37).[8] "To achieve the Commission's equal population goal based on 2020 Census data, the Commission's population target for each of the five districts was 134,944 with a +/- 1% population variance." (23-cv-443, Doc. 1, p. 17, ¶ 41).

To reach the Commission's goal of population equality, the Commissioners worked with Jefferson County Board of Registrars Chair Barry Stephenson to draw new boundary lines for the county's five districts. (23-cv-443, Doc. 1, pp. 15–16, ¶¶ 36–37). According to the *McClure* plaintiffs, "much of the negotiations surrounding the redistricting process and the plans proposed by the Commission occurred outside the public forum." (23-cv-443, Doc. 1, p. 20, ¶ 58; *see also* 23-cv-443, Doc. 1, p. 21, ¶ 59). During an October 5, 2021, work session, Mr. Stephenson discussed three options for redistributing the populations of the five districts. (23-cv-443, Doc. 1,

---

[8] This allegation seems to be undisputed. In his declaration, the Chairman of the Board of County Registrars stated that based on the 2020 census results, the Commission "was required to redistrict to bring each district back to population equality." (23-cv-443, Doc. 31, p. 4, ¶ 11). As discussed below, there is no requirement of "population equality" under federal law.

pp. 16, 18, ¶¶ 39, 45).[9]   Two days later, during a Commission meeting, the Commissioners voted to allow the public to inspect the alternative plans for two weeks and to conduct a public hearing on the proposed plans on November 4, 2021. (23-cv-443, Doc. 1, p. 19, ¶ 49).   At the November 4, 2021 hearing, the Commissioners spoke, and following public comment, the Commission adopted the first of the three proposed plans.  (23-cv-443, Doc. 1, pp. 19-20, ¶¶ 50, 52, 56).

According to the plaintiffs, of the almost 13,000 voters who the Commission moved into District 1 under the 2021 redistricting plan, approximately 10,000 (77.46%) are Black, and approximately 2,000 (16.11%) are non-Hispanic white residents.  (23-cv-443, Doc. 1, pp. 27–28, ¶ 83).  In District 2, approximately 5,600 (41%) of the voters who the Commission moved into the district under the 2021 plan are Black.  (23-cv-443, Doc. 1, p. 28, ¶ 84).  In District 3, under the 2021 redistricting plan, of the almost 1,600 voters who the Commission moved into the district, 1,400 (87.84%) are white, and 85 (5.32%) are Black.  (23-cv-443, Doc. 1, p. 28, ¶ 86).  Similarly in District 4, of the 4,787 voters who the Commission moved into the district under the 2021 redistricting plan, approximately 3,900 (80.68%) are white.  (23-cv-443, Doc. 1, p. 29, ¶ 88).  Under the 2021 redistricting plan, "[a]lthough District 4 was overpopulated based on the 2020 census," the Commission added

---

[9] This allegation is undisputed.  (23-cv-443, Doc. 31, p. 5, ¶¶ 13, 14, 16).

"nearly 5,000 residents []to the [d]istrict from District 5: about 3,900 white residents and 400 Black residents. Moving white population from District 5 into District 4 allowed for the removal of roughly 1,400 Black residents from District 5 into District 2." (23-cv-443, Doc. 1, p. 29, ¶ 89; *see also* 23-cv-443, Doc. 1, p. 24, ¶ 69).

The plaintiffs contend that under the Commission's 2021 redistricting plan, Black citizens constitute 78.27% of the total population in District 1 and 66.18% of the total population in District 2. (23-cv-443, Doc. 1, p. 11, ¶ 23; 23-cv-503, Doc. 1, p. 13, ¶ 44). The Black population in District 3 fell from 30.06% to 27.29%, and the Black population in District 4 fell from 32.46% to 28.45%; the Black population in District 5 remained at 14%. (23-cv-503, Doc. 1, p. 13, ¶ 44; 23-cv-443, Doc. 1, p. 11, ¶ 23; 23-cv-443, Doc. 1, p. 10, ¶ 22 (alleging that under its 2021 redistricting plan, the Commission "strip[ped] Black voters from adjacent districts 3, 4, and 5" to pack Black voters in Districts 1 and 2)).[10] Under the Commission's 2021 plan, the registered Black voter percentage is 79.51% in District 1, 70.88% in District 2,

---

[10] The Commission's data varies slightly from these allegations. According to Mr. Stephenson, following the 2020 census, under the 2021 redistricting plan, Black citizens constituted 76.5% of the total population in District 1, 64.50% of the total population in District 2, 26.2% of the total population in District 3, 27.1% of the total population in District 4, and 13.1 % of the total population in District 5. (23-cv-443, Doc. 31-3, p. 2). According to the Commission's data, following the 2010 census, Black citizens constituted 76.14 of the total population in District 1, 73.39% of the total population in District 2, 22.90% of the total population in District 3, 25.08% of the total population in District 4, and 11.61% of the total population in District 5. (23-cv-443, Doc. 31-3, p. 2).

24.93% in District 3, 26.09% in District 4, and 10.09% in District 5.  (23-cv-443, Doc. 1, p. 11, ¶ 23).

The plaintiffs assert that the Commission considered two plans that would have better served the Commission's stated goal of near mathematical equality across districts. (23-cv-443, Doc. 1, p. 20, ¶ 57).   The 2021 redistricting plan had a population deviation of 1.73%, a higher deviation than the other two plans.  (23-cv-443, Doc. 1, pp. 20, 24, ¶¶ 57, 71).  The plan the Commission adopted overpopulated District 1, added Black voters to District 2, and "split[] 52 cities, towns, and unincorporated places" and 52 of 120 Jefferson County voting precincts.  (23-cv-443, Doc. 1, p. 25, ¶ 73; 23-cv-503, pp. 13-14, ¶ 45).  For example, under the 2021 plan, the Commission severed the predominately Black neighborhoods of Oxmoor and Rosedale from other communities in the City of Homewood, removing the Oxmoor and Rosedale communities from District 3, a predominantly white district, and placing those communities in District 2, a predominantly Black district.  (23-cv-443, Doc. 1, pp. 28–30, ¶¶ 85, 89).   The Commission also divided the City of Irondale three ways, placing the section with the highest Black population in District 1 and placing the other two sections in Districts 4 and 5.  (23-cv-443, Doc. 1, p. 29, ¶ 88).  The Commission president allegedly stated that under the 2021 plan, "the district lines are smooth," (23-cv-443, Doc. 1, p. 22, ¶ 65), but the plaintiffs allege that is not so, and the districts are not compact.  On the Polsby Popper compactness

scale, on which a 1 is most compact and 0 is least, under the Commission's 2021 plan, Jefferson County's five districts score as follows:

| District | Polsby-Popper Score |
|----------|---------------------|
| 1        | .12                 |
| 2        | .23                 |
| 3        | .18                 |
| 4        | .20                 |
| 5        | .22                 |

(23-cv-443, Doc. 1, p. 27, ¶ 80).

The plaintiffs contend that the Commission's alleged deviation from its stated goal of population equality, the Commission's alleged splitting of municipalities along racial lines to move Black communities in those cities to two majority Black districts, and the Commission's alleged deviation from ordinary redistricting principles such as compactness evidence racial gerrymandering in the Commission's 2021 redistricting plan. The plaintiffs allege that the Commission could have met its obligations under the Voting Rights Act without packing Black voters into Districts 1 and 2, (23-cv-443, Doc. 1, pp. 30-31, ¶¶ 92, 94; 23-cv-503, Doc. 1, p. 14, ¶ 46), and that by "stripping Black voters from Districts 3, 4, and 5, the Commission ensured that [the numbers of] Black voters in these districts were kept unnecessarily

low, rendering their voice ineffective in elections in these districts," (23-cv-443, Doc. 1, p. 32, ¶ 97).  To correct this alleged racial gerrymandering, the plaintiffs contend that the Commission should have to re-draw the district boundaries, and the plaintiffs ask the Court to order new elections based on a remedial map.

## II.

Against this backdrop, the Court turns to the defendants' motions to dismiss. In their motion to dismiss, the individual commissioners argue persuasively that the Court should dismiss the plaintiffs' official capacity claims against them.  Because "local government units can be sued directly" in lawsuits brought under 42 U.S.C. § 1983, and because suits against municipal officials are functionally "suits against the city that the officer represents," a plaintiff does not have to "bring official-capacity actions against local government officials." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citations omitted).  A plaintiff may simply sue a municipality directly.  *Busby*, 931 F.2d at 776.  In fact, including a city and its officers in their official capacities as defendants in an action like this is "redundant and possibly confusing to [a] jury." *Busby*, 931 F.2d at 776.  Therefore, the Court dismisses the plaintiffs' claims against defendants James A. Stephens in his official capacity as Commission President, T. Joe Knight in his official capacity as Commission President Pro Tempore, Shelia Tyson in her official capacity as Commissioner, Steve Ammons in his official capacity as Commissioner, and Lashunda Scales in her

official capacity as Commissioner.

### III.

The Commission argues that because it does not administer elections, it cannot provide the remedy the plaintiffs seek, so the Court should dismiss the Commission from this action.  (23-cv-443, Doc. 19, pp. 24–25; Doc. 20, pp. 23–25; Doc. 20, p. 24 (stating that the plaintiffs "must name [as defendants] those responsible for carrying out elections pursuant to the [2021 redistricting plan], not those who enacted it.")).  This argument concerns redressability, a concept related to the plaintiffs' standing to bring a claim.  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019).[11]  Stated simply, the plaintiffs may not pursue a claim against the Commission if an order from this Court to the Commission will not directly or indirectly redress the plaintiffs' alleged injury.  *Lewis*, 944 F.3d at 1301.

The record indicates that the Commission may provide the relief the plaintiffs seek.  In their complaint, the *McClure* plaintiffs ask the Court to, among other things, declare that the voting districts that the Commission adopted in its 2021 redistricting plan are racially gerrymandered in violation of the Fourteenth Amendment to the United States Constitution, enjoin the Commission "from using the racially

---

[11] To establish standing, litigants must demonstrate that they have suffered an injury-in-fact, that the injury is "'fairly traceable' to the defendant's conduct," and that a favorable judgment likely will redress the injury.  *Lewis*, 944 F.3d at 1296 (alteration adopted) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992)).

gerrymandered map adopted in the 2021 redistricting cycle," and compel the Commission to immediately "adopt and enact a constitutional districting plan." (23-cv-443, Doc. 1, p. 34).   In their complaint, the *Addoh-Kondi* plaintiffs ask the Court to declare that the 2021 redistricting plan is racially gerrymandered, to enjoin the Commission from using the 2021 redistricting plan in future elections, and to require the Commission to "promptly adopt a remedial redistricting plan that complies with the Constitution and the laws of the United States and the State of Alabama." (23-cv-503, Doc. 1, pp. 20–21).   Alabama law confers on the Commission the authority to "alter the boundaries of the [voting] districts" in Jefferson County.  Ala. Code § 11-3-1.1(a).   In fact, should the Court order remedial redistricting, only the Commission can provide this relief.   Therefore, the Commission's redressability argument is not persuasive.[12]

---

[12] In their motion for a preliminary injunction, the *McClure* plaintiffs ask the Court to order a special election pursuant to a remedial redistricting plan. (23-cv-443, Doc. 26, p. 4). Similarly, in their motion for a preliminary injunction, the *Addoh-Kondi* plaintiffs ask the Court to require the Commission to "enact a remedial districting plan" and to "[o]rder the remedial plan to be used in special mid-term elections for all five Commission districts during the regularly scheduled countrywide elections in 2024." (23-cv-503, Doc. 20, pp. 3–4). Should the plaintiffs establish that the voting districts in the 2021 plan are racially gerrymandered, though the Court may order the Commission to enact a remedial plan, it does not appear that the Commission can implement a special election. Under Alabama law, a special election may be held when a vacancy occurs in a county office "filled by election of the people" or "[i]n such other cases as are or may be provided by law." Ala. Code § 17-15-1(4)-(5). "All special elections provided for by this chapter are to be ordered by the Governor, who must issue writs of election, directed to the judge of probate of the counties in which such election is required to be held and must specify therein the. . . county in which, and the day on which, such election is to be held [and] the cause and object of the same . . . ." Ala. Code § 17-15-3. This aspect of Alabama law may complicate the plaintiffs' request in their preliminary injunction motions for a special election, but it does not change the fact that much

# IV.

The Commission also argues that the Court should dismiss the plaintiffs' §
1983 claims because the plaintiffs have not plausibly alleged that the Commission
selected district boundaries in 2021 based predominantly on race.  Consequently, the
Commission argues, the plaintiffs have not stated a claim under the Fourteenth
Amendment, so the Court should dismiss the plaintiffs' § 1983 claim pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (23-cv-443, Doc. 19, pp. 27–
37; Doc. 20, pp. 13–23).

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure
to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).
Pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must
contain "a short and plain statement of the claim showing that the pleader is entitled
to relief."  FED. R. CIV. P. 8(a)(2).  Generally, to survive a Rule 12(b)(6) motion to
dismiss and meet the requirements of Rule 8(a)(2), "'a complaint does not need
detailed factual allegations,' but the allegations 'must be enough to raise a right to
relief above the speculative level,'" *Speaker v. U.S. Dep't of Health & Human Servs.
Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), and a plaintiff's

---

of the relief the plaintiffs request in their complaints is available through the Commission.
Therefore, the Court will not dismiss the plaintiffs' claims against the Commission.

statement of a claim must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

When deciding a Rule 12(b)(6) motion to dismiss, a district court must accept a plaintiff's well-pleaded factual allegations as true and must view the allegations in a complaint in the light most favorable to the plaintiff. *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022). Therefore, to resolve the Commission's Rule 12(b)(6) motions to dismiss, the Court views the allegations in the complaints in the light most favorable to the *McClure* and *Addoh-Kondi* plaintiffs.

The Commission's Rule 12(b)(6) arguments for dismissal are flawed, in part, because the Commission takes the opposite tact; the Commission zooms in on factual allegations favorable to the Commission, overlooks the context for those allegations, and sidesteps allegations that support the plaintiffs' gerrymandering claims. For example, the Commission argues that the allegations in the *McClure* complaint "show[] that most voters added to District 2," one of the two predominantly Black districts in Jefferson County, "were white voters, resulting in a substantial decline in Black Voting Age Population (BVAP) in that district." (23-cv-443, Doc. 42, p. 8). For this proposition, the Commission cites paragraphs 23 and 84 of the *McClure* complaint. (23-cv-443, Doc. 1, pp. 11, 28, ¶¶ 23, 84).

In paragraph 23 of their complaint, the *McClure* plaintiffs allege that the

"2021 registered Black voter percentage" in District 2 was 70.88%.  (23-cv-443, Doc. 1, p. 11, ¶ 23).  The plaintiffs allege that under the 2021 redistricting plan, District 2 has an "any part Black population of 66.18%."  (23-cv-443, Doc. 1, p. 11, ¶ 23).  In paragraph 84, the *McClure* plaintiffs assert that of the 13,600 individuals the Commission moved into District 2 under the 2021 plan, 41% were Black.  (23-cv-443, Doc. 1, p. 28, ¶ 84).  From this last data point, the Commission argues that the plaintiffs' data "shows that most voters added to District 2 were white voters," so the "[p]laintiffs own allegations belie their alleged theory that the Commission 'selectively ensur[ed] that voters added to District 2 were Black people.'"  (23-cv-443, Doc. 42, pp. 8-9) (quoting 23-cv-443, Doc. 1, ¶ 57).  But that's not so.

The *McClure* plaintiffs' allegations regarding District 2 concern the Commission's purported machinations in moving individuals into District 2, one of the two districts whose population decreased in the 2020 Census.  In paragraph 84, the *McClure* plaintiffs assert that "specific Black neighborhoods were selected for inclusion in District 2."  (23-cv-443, Doc. 1, p. 28, ¶ 84).  For example, the plaintiffs allege that the Commission carved the Black neighborhoods of Oxmoor and Rosedale from the City of Homewood and placed those neighborhoods in District 2 while leaving the rest of the City of Homewood in District 3.  (23-cv-443, Doc. 1, pp. 29–30, ¶ 89).  The plaintiffs also allege that "[a]lthough District 4 was overpopulated based on the 2020 census," the Commission added "nearly 5,000

residents . . . to the [d]istrict from District 5:  about 3,900 white residents and 400 Black residents. Moving white population from District 5 into District 4 allowed for the removal of roughly 1,400 Black residents from District 5 into District 2."  (23-cv-443, Doc. 1, p. 29, ¶ 89; *see also* 23-cv-443, Doc. 1, p. 24, ¶ 69).  These factual allegations undergird the plaintiffs' contention that the Commission "selectively ensur[ed] the voters added to District 2 were Black people."  (23-cv-443, Doc. 1, p. 20, ¶ 57).  The Commission's failure to account for these allegations concerning the Commission's purported racial dismantling of municipalities and reshuffling of Black and white populations to reach racial targets turns the standard for dismissal on its head and undermines the Commission's argument procedurally.[13]

---

[13] The argument fares no better substantively.  In *Alabama Legislative Black Caucus v. Alabama*, the United States Supreme Court stated:  "We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*."  575 U.S. 254, 262-63 (2015) (italics in *Ala. Legislative Black Caucus*).  The Supreme Court held that the Alabama district court in that case erred in finding for the State of Alabama on the plaintiffs' racial gerrymandering claim based on a finding that race did not predominate in the drawing of some districts' boundary lines.  575 U.S. at 263-64.  The Supreme Court stated:  "A showing that race-based criteria did not significantly affect the drawing of *some* Alabama districts, however, would have done little to defeat a claim that race-based criteria predominantly affected the drawing of *other* Alabama districts, such as Alabama's majority-minority districts primarily at issue here. . . . [W]e must remand for consideration of racial gerrymandering with respect to the individual districts subject to the appellants' racial gerrymandering challenges."  575 U.S. at 264 (italics in *Ala. Legislative Black Caucus*); *see also Bush v. Vera*, 517 U.S. 952, 965 (1996) (stating that a district court must "scrutinize each challenged district to determine whether . . . race predominated over legitimate districting considerations . . . .").  Therefore, even if the Commission had properly presented the *McClure* plaintiffs' allegations with respect to District 2 as a whole and in the light most favorable to the plaintiffs and, having done so, could somehow argue that the *McClure* plaintiffs have not plausibly alleged that race was the predominant factor in the Commission's selection of the voters the Commission moved to District 2, the Court still would not dismiss the *McClure* complaint because the Commission's argument does not account for Districts 1, 3, 4, and 5.

With respect to the *Addoh-Kondi* plaintiffs, the Commission argues that those plaintiffs allege that the Commission improperly failed to act and that a failure to act cannot form the basis of a racial gerrymandering claim.  (23-cv-503, Doc. 46, pp. 10, 16) (citing 23-cv-503, Doc. 1, ¶¶ 10, 57).  The Com mission asserts that the Constitution did not require it "to depart from its existing lines to adopt a redistricting plan with fewer municipal splits or different dispersion of Black or white voters."  (23-cv-503, Doc. 46, p. 16).

The *Addoh-Kondi* plaintiffs contend that in adjusting the boundaries of the five districts in Jefferson County following the 2020 Census, the Commission assigned voters to districts based on the voters' race, and the Constitution "prohibits classifying voters on the basis of race for any reason, good, bad, or indifferent, absent a compelling state interest."  (23-cv-503, Doc. 1, p. 5, ¶ 10).  The *Addoh-Kondi* plaintiffs contend that the redistricting plans the Commission selected following the 1990, 2000, and 2010 censuses "all perpetuated the two super-majority Black districts and thee majority-White established in the 1985 plan," (23-cv-503, Doc. 1, p. 11, ¶ 37), and that in adopting the 2021 plan, the Commissions failed "to consider whether the race conscious design and target populations of the 1985 Consent Decree were still needed," (23-cv-503, Doc. 1, p. 17, ¶ 57).  According to the *Addoh-Kondi* plaintiffs, following the 2020 Census, if the Commission selected district boundaries without respect to race, Black voters would have "an opportunity to elect

candidates of their choice in at least three districts," (23-cv-503, Doc. 1, p. 3, ¶ 6), but "the racially packed districts in the 2021 plan prevent the formation of either a third majority-Black district or one or more 'crossover' districts, that is, districts in which less than a Black majority can combine with reliable White voter support to elect candidates favored by Black voters," (23-cv-503, Doc. 1, p. 4, ¶ 7).[14]

The *Addoh-Kondi* plaintiffs assert that because race was the Commission's predominant consideration in selecting the 2021 district boundaries, rather than seizing an opportunity to unwind violations of traditional redistricting principles that have compounded since the Commission implemented the 1985 consent decree, the Commission made matters worse.  The *Addoh-Kondi* plaintiffs allege that the 2021 redistricting plan "increases the number of split census places from 22 to 25, all but three of which . . . are incorporated municipalities," and "[n]ineteen of those divided census places are in majority-Black Districts 1 and 2."  (23-cv-503, Doc. 1, pp. 13-

---

[14] This allegation and similar allegations in the *Addoh-Kondi* and *McClure* complaints, (23-cv-443, Doc. 1, p. 10, ¶¶ 20-22; 23-cv-503, Doc. 1, p. 5, ¶ 10), whisper – and occasionally affirmatively assert – vote dilution, a Fourteenth Amendment claim based on a public entity's alleged intent to dilute the vote of racial or ethnic minorities by "minimiz[ing] or cancel[ing] out the voting potential" of those voters.  *Abbott v. Perez*, 138 S.Ct. 2305, 2314 (2018).  The inclusion of these allegations does not compel the plaintiffs to actively pursue an *Abbott* claim, and the *Addoh-Kondi* plaintiffs specifically disavow an *Abbot* claim for intentional discrimination, (23-cv-503, Doc. 1, pp. 4–5, ¶ 10).  The *McClure* plaintiffs allege that "there was no 'strong basis in evidence[]' to conclude that vote dilution, in violation of [the Voting Rights Act] § 2, would occur in the absence of the supermajority Black districts the Commission created in Districts 1 and 2." (23-cv-443, Doc. 1, p. 32, ¶ 100) (citing *Shaw v. Reno*, 509 U.S. 630, 656 (1993)).  The Court understands that the plaintiffs' allegations relating to vote dilution inform their gerrymandering claims, but neither set of plaintiffs pursues a separate claim for intentional discrimination under *Abbott*.

14, ¶ 45; *see also* 23-cv-503, Doc. 1, p. 18, ¶ 58).

The *Addoh-Kondi* plaintiffs allege that the Commission must "restore traditional districting principles." (23-cv-503, Doc. 1, p. 2, ¶ 2). The *Addoh-Kondi* plaintiffs assert that the Supreme Court has identified cohesion of political subdivisions within districts as a leading districting principle, that the Commission split two dozen municipalities with most of the splits occurring "along racial lines" between the majority-Black districts and the majority-White districts, and that "[s]uch transgressions of arguably the most important traditional principle is completely unnecessary and cannot be explained on any basis other than race." (23-cv-503, Doc. 1, pp. 18-19, ¶¶ 58, 59). The *Addoh-Kondi* plaintiffs state that though population shifts in Jefferson County required the Commission to extend the geographic boundaries of Districts 1 and 2, the Commission opted to revise those boundaries on the basis of race so that the Commission maintained the Black majorities in Districts 1 and 2 and reduced the Black populations in Districts 3 and 4, two majority-White districts. (23-cv-503, Doc. 1, p. 13, ¶ 44). According to the *Addoh-Kondi* plaintiffs, "a race-neutral [redistricting] plan will comply with Section 2 of the Voting Rights Act, making any race-conscious drawing unnecessary." (23-cv-503, Doc. 1, p. 14, ¶ 46).

In short, the *McClure* and *Addoh-Kondi* plaintiffs allege that race dominated the Commission's decision when the Commission adopted its 2021 redistricting

plan.  The Fourteenth Amendment's Equal Protection Clause demands "racial neutrality in governmental decision making," and the clause prohibits a state actor from "separat[ing] its citizens into different voting districts on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 904, 905 (1995).  Per the Supreme Court's decision in *Shaw v. Reno*, 509 U.S. 630 (1993), a plaintiff may state a § 1983 claim for violation of the Equal Protection Clause by alleging that "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines."  *Miller*, 515 U.S. at 913.  To prevail on such a racial gerrymandering claim, a plaintiff must demonstrate that the defendant "intentionally assign[ed] citizens to a district on the basis of race without sufficient justification."  *Abbott v. Perez*, 138 S.Ct. 2305, 2314 (2018).

Racial gerrymandering occurs when, for example, a governing body "adds more minority voters [to a voting district] than needed for a minority group to elect a candidate of its choice."  *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015).  In a racial gerrymandering case,

> [t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the [governing body's] decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the [governing body] subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where these or other race-neutral considerations are the basis for

redistricting legislation, and are not subordinated to race, a State can "defeat a claim that a district has been gerrymandered on racial lines." *Shaw, supra*, 5[09] U.S., at 647, 113 S.Ct., at 2827. These principles inform the plaintiff's burden of proof at trial. Of course, courts must also recognize these principles, and the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed.

*Miller*, 515 U.S. at 916-17.

"'[P]redominance' in the context of a racial gerrymandering claim is special." *Ala. Legislative Black Caucus*, 575 U.S. at 273.  Predominance concerns "whether the legislature placed race above traditional districting considerations in determining *which* persons were placed *in appropriately apportioned districts*." *Ala. Legislative Black Caucus*, 575 U.S. at 273 (internal marks omitted; italics in *Ala. Legislative Black Caucus*).  "In other words, if the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the 'predominance' question concerns *which* voters the legislature decides to choose, and specifically whether the [governing body] predominately use[d] race as opposed to other, 'traditional' factors when doing so." *Ala. Legislative Black Caucus*, 575 U.S. at 273 (italics in *Ala. Legislative Black Caucus*).

The *McClure* and *Addoh-Kondi* plaintiffs plausibly allege that the Commission, in redistributing voters to achieve population equivalence among Jefferson County's five single-member districts, removed Black voters from the

three predominantly white districts – Districts 3, 4, and 5 – and placed those Black voters in the county's two majority Black districts, Districts 1 and 2. (23-cv-443, Doc. 1, pp. 22, 29–30, ¶¶ 64, 88–89; 23-cv-503, Doc. 1, p. 13, ¶ 44).[15] The *McClure* plaintiffs allege that 77.46% of the approximately 13,000 individuals the Commission moved into District 1 are Black, (23-cv-443, Doc. 1, pp. 27–28, ¶ 83), and 41% of the approximately 13,600 individuals the Commission moved into District 2 are Black, (23-cv-443, Doc. 1, p. 28, ¶ 84). Moreover, the *McClure* plaintiffs allege that, although Districts 3, 4, and 5 were overpopulated in 2020 by the population equivalency metric, the Commission moved 1,600 residents into District 3, 87.84% of whom are white and 5.32% of whom are Black. (23-cv-443, Doc. 1, p. 28, ¶ 86). The *McClure* plaintiffs allege that the Commission moved 9,409 voters, 7,777 of whom were Black, from District 4 into District 1 and then

---

[15] The Commission's redistricting work operated from a faulty premise. As noted earlier, the Chairman of the Board of County Registrars stated that in redistricting, the Commission had to "bring each district back to population equality." (23-cv-443, Doc. 31, p. 3, ¶ 11). In his presentation to the Commission, the Chairman reported: "In Reynolds vs. Sims, the U.S. Supreme Court ruled that districts have to be reapportioned so that each district has approximately equal population." (23-cv-443, Doc. 31-2, p. 2). Based on this proposition, the Chairman advised the Commission that the "[p]opulation target per district was 134,944." (23-cv-443, Doc. 31-2, p. 4). As the Supreme Court explained in *Alabama Legislative Black Caucus*, Supreme Court precedent does not require "the theoretical, precisely equal ideal;" a 1% deviation standard is *"a more rigorous deviation standard than* [Supreme Court] precedents have found necessary under the Constitution. *See Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (5% deviation from ideal generally permissible)." *Ala. Legislative Black Caucus*, 575 U.S. at 259; *see also Gaffney v. Cummings*, 412 U.S. 735, 751 (1973) (A 7.83% maximum deviation in the redistricting plan did not support "a prima facie case of invidious discrimination under the Fourteenth Amendment."). Still, "[n]o one []doubts the desirability of a [governing body's] efforts generally to come close to a one-person, one-vote ideal." *Ala. Legislative Black Caucus*, 575 U.S. at 259.

moved 4,800 individuals into District 4, 3,900 of whom are white. (23-cv-443, Doc. 1, p. 29, ¶ 88). The *Addoh-Kondi* plaintiffs allege that because of these transfers, under the Commission's 2021 redistricting plan, the Black population in District 3 fell from 30.06% to 27.29%, and the Black population in District 4 fell from 32.46% to 28.45%. (23-cv-503, Doc. 1, p. 13, ¶ 44). If proven, these alleged facts would provide evidence that race was the predominant factor motivating the Commission's decision to place a significant number of voters within or without the county's five districts. *Miller*, 515 U.S. at 916.

The plaintiffs plausibly allege that to accomplish its purpose of sifting Black voters from districts 3, 4, and 5 to move those voters to districts 1 and 2, the Commission departed from the traditional redistricting practices of "compactness, contiguity, [and] respect for political subdivisions or communities," *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. at 272, and split 52 cities, subdivisions, neighborhoods, and municipalities, including Black neighborhoods in Irondale, Fultondale, Center Point, Rosedale, Oxmoor, Birmingham, and North Smithfield. (23-cv-443, Doc. 1, pp. 23–25, 29–30, ¶¶ 67, 73, 75, 87, 89; 23-cv-503, Doc. 1 pp. 4, 10, 12-–14, 18, ¶¶ 7–8, 34, 41–42, 45, 58). All five of the county's districts earn very low scores on the Polsby-Popper compactness scale: District 1, .12; District 2, .23; District 3, .18; District 4, .20; and District 5, .22. (23-cv-443, Doc. 1, p. 27, ¶

80).[16]  If proven, these alleged facts would provide evidence that the Commission subordinated traditional race-neutral districting principles and that race was the predominant factor motivating the Commission's decision to place a significant number of voters within or without the county's five districts.

Thus, viewing the allegations in the plaintiffs' complaints in the light most favorable to the plaintiffs, both complaints satisfy Rule 8 and withstand scrutiny under Rule 12(b)(6).  The plaintiffs have alleged facts which raise a right to relief above the speculative level.  Therefore, the Court denies the Commission's motions to dismiss pursuant to Rule 12(b)(6).

## V.

Because the plaintiffs may pursue their racial gerrymandering claims, the Court must evaluate the plaintiffs' requests for early injunctive relief.  (23-cv-443, Doc. 26, pp. 1–4; 23-cv-503, Doc. 30, pp. 1–4).  Rule 65 of the Federal Rules of Civil Procedure governs motions for preliminary injunction.  FED. R. CIV. P. 65.  A

---

[16]  As circumstantial evidence of purpose, the plaintiffs also cite Commissioner Scales's statement that "despite having the opportunity to vote for Plans 2 and 3, which would better achieve the Commission's redistricting goal of near mathematical equality in population across all Commission districts, the Commission voted to adopt Plan 1, which deviated from this goal." (23-cv-443, Doc. 1, p. 21, ¶ 60); see Vill. of Arlington Heights v. Metro Hous. Dev. Corp., et al., 429 U.S. 252, 266–268 (1977) (court evaluating predominant purpose may consider "statements by members of the decisionmaking body").  Likewise, the plaintiffs cite the Commission president's allegedly incorrect statement that under the 2021 plan, "the district lines are smooth," (23-cv-443, Doc. 1, p. 29, ¶ 88).

party seeking a preliminary injunction must demonstrate that "'(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.'" *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (citation omitted).   A preliminary injunction "'is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[s] the 'burden of persuasion'' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (citation omitted).  In deciding a motion for preliminary injunction, a district court must have "'particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

To obtain a preliminary injunction, a plaintiff must demonstrate that "irreparable injury is *likely* in the absence of an injunction" and that the plaintiff will "'suffer irreparable harm before a decision on the merits can be rendered.'" *Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (italics in *Winter*). In the context of racial gerrymandering, the harms caused by an alleged constitutional violation "are personal.  They include being 'personally . . . subjected

to a racial classification,' as well as being represented by a legislator who believes his 'primary obligation is to represent only the members' of a particular racial group." *Ala. Legislative Black Caucus*, 575 U.S. at 263 (quoting *Bush v. Vera*, 517 U.S. 952, 957 (1996), and *Shaw*, 509 U.S. at 648).

Here, though the harm is serious and is inflicted each day a voter is subjected to a racial classification, the plaintiffs' conduct belies their argument that, absent a preliminary injunction, they will suffer irreparable harm before the Court may render a decision on the merits. There is no evidence that the plaintiffs attempted to challenge the 2021 redistricting plan when the Commission posted the plan for public comment in November 4, 2021. (23-cv-443, Doc. 1, p. 19, ¶ 52). The current commissioners were elected to serve a four-year term pursuant to the 2021 redistricting plan in November 2022. (23-cv-443, Doc. 1, p. 9, ¶ 17; *see also* 23-cv-443, Doc. 1-1, p. 2). The plaintiffs did not file this action until April 2023. (23-cv-443, Doc. 1). *See Wreal, LLC v. Amazon.com, Inc*., 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm. A preliminary injunction requires showing 'imminent' irreparable harm."). In addition, there is no election on the immediate horizon; the next Jefferson County Commissioner election is not until 2026. (23-cv-443, Doc. 32, p. 3, ¶ 6).

Given the plaintiffs seeming lack of urgency and the fact that no Commission election is looming, the plaintiffs have not carried their demanding burden of establishing an immediate and irreparable harm in the absence of a preliminary injunction.  This failure of proof prevents the plaintiffs from securing a preliminary injunction. *Robertson*, 147 F.3d at 1306; *see also Wreal*, 840 F.3d at 1248 ("Because [a plaintiff] must meet all four prerequisites to obtain a preliminary injunction, failure to meet even one dooms its appeal.").

Though not irreparable for purposes of a preliminary injunction, the harm the plaintiffs allege is serious and worthy of address before the next scheduled Commission election if the plaintiffs prove the alleged constitutional violation.  A court must act promptly to eliminate racial classifications if they are proven. Therefore, the Court will expedite the proceedings in this matter to resolve the constitutional questions presented as quickly as possible so that, if the plaintiffs prove their racial gerrymandering claims, the Court may order a remedy well before the 2026 Commission election.[17]

## VI.

For the reasons stated above, the Court grants in part and denies in part defendants' motions to dismiss (23-cv-443, Doc. 19; 23-cv-503, Doc. 24).  The

---

[17] The next Jefferson County Commission primary election is scheduled in May 2026, and the general election is scheduled in November 2026.  (23-cv-443, Doc. 32, p. 4, ¶ 6).

Court dismisses the plaintiffs' claims against the individual commissioners.  The plaintiffs' claims against the Commission shall proceed.  On the record before it, the Court denies the plaintiffs' motion for preliminary injunction.  The Court sets this matter for a scheduling conference by Zoom on Thursday, January 11, 2024, at 11:00 AM CT.  The Court will provide the parties with a link for the video conference via email.  The parties shall confer in advance of the scheduling conference and shall email to the Court a proposed scheduling order before the conference.

The Clerk shall please TERM Docs. 19, 20, and 26 in Case 23-cv-443 and Docs. 20, 23, and 24 in Case 23-cv-503.

**DONE** and **ORDERED** this December 19, 2023.

**MADELINE HUGHES HAIKALA**

UNITED STATES DISTRICT JUDGE